*Stinson v. Union Mutual Fire Ins. Co.*, 103-7-18 Oecv (Harris, J., Apr. 1, 2019)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Orange Unit | CIVIL DIVISION<br>Docket No. 103-7-18 Oecv |
| Dylan Stinson,<br>    Plaintiff<br><br>v.<br><br>Union Mutual Fire Ins. Co.,<br>John J. Boylan,<br>Boylan Associates, PC,<br>    Defendants | ENTRY ORDER |

Pending before the court are (by the court's count) eleven motions, which including the motions, have generated by the court's count a total of 32 or so motion memoranda for the court's consideration.

The undisputed relationships between the parties frames the legal claims asserted in this case, which in turn sets the stage for the pending motions.

Dylan Stinson ("Stinson"), then 17 years old, was present at a May 2009 party during which the trespassing teens started and outdoor chiminea fire. The fire later spread and destroyed Kevin and Linda Flanagan's Ludlow, Vermont home and contents. At the time Stinson was a family member residing with his mother, Michelle Stinson, who had purchased a homeowners insurance policy from Union Mutual Insurance Company ("UMIC"), via a local insurance agency (the "UMIC Policy"). The UMIC Policy had a liability coverage limitation of $300,000.

The destroyed home's owners were insured by Concord General Mutual Insurance Company ("Concord"), which, represented by Attorney Thomas Nuovo, pursued a subrogation action against Stinson for the fire loss. (The "Subrogation Action"). Potential damages exceeded $300,000. Certain liability issues existed, primarily as to Stinson's legal responsibility for the fire relating to his degree of participation in building, starting and attending to the chiminea fire. UMIC provided Stinson defense counsel in the Subrogation Action, namely John C. Boylan III, Esq. ("Boylan"), practicing with his firm Boylan Associates, PC. (collectively with Boylan, the "Boylan Defendants"). UMIC assigned a claims adjuster, Donna Graham ("Ms. Graham"), to the file. Certain pre-trial settlement offers were made, during and outside of a mediation that occurred, but no settlement was reached.

A 2014 trial resulted in a $585,829.91 judgement (before post-judgment interest), that was affirmed on appeal on 4/22/16. *Concord Gen. Mut. Ins. Co. v. Gritman*, 2016 VT 45, 202 Vt. 155 ("*Gritman*"). UMIC paid $300,000 of the judgment, which left Stinson personally liable for a large unpaid judgment balance.

Since the trial, Stinson assigned his claims against UMIC and Boylan (as further described below) to Concord.

Under the Amended Complaint Stinson[1] asserts various tort claims. He has sued UMIC for insurer bad faith and for violation of the Vermont Consumer Protections Act, 9 V.S.A, Section 2451 et seq ("VCPA"). He has sued Boylan and his firm for malpractice.

With the stage set, the court springboards into the pending motions….

At the outset the court denies the Defendants' Motion to Strike the Plaintiff's Supplemental Statement of Undisputed Material Facts. Given the succession of competing motions for summary judgment on the substantive claims, the court finds the filing proper. As each party has asserted facts it deems undisputed, and pointed to alleged lack of proof orom the opposing side on some issues, the responding submissions have admitted some facts as undisputed, shown some facts to be disputed, and sometimes responded to assertions that no evidence existed on some issues. Rule 56(e)(1) allows the court to allow each party the opportunity to properly support or address a fact. The court will accept the statements of material disputed and undisputed facts as keeping the court well-informed as to the record citations correlating to the parties' factual assertions. The 9/17/19 Motion to Strike is denied.

In considering the three motions for summary judgment, the court applies the familiar standard, which it sets out here but applies as to each of the motions. Under Rule 56 a party is entitled to summary judgment in its favor if the movant shows that, there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law. In determining whether genuine issues of fact exist, the non moving party is to receive the benefits of all reasonable doubts and inferences. *Samplid Enterprises, Inc. v. First Vermont Bank*, 165 Vt. 22 (1996); *Messier v. Metro. Life Ins. Co*., 154 Vt. 406 (1990). Although the nonmoving party should be

---

[1] Strictly speaking although the caption designates Stinson as the plaintiff, the real party in interest asserting this action is Concord, under the assignment of claims it obtained form Stinson. As under that agreement Stinson is to cooperate with Concord and he may obtain a share of portions of the recovery, that is not germane to Stinson being shown as the plaintiff. V.R.C.P. 17(a) allows an insurer to sue in the name of an assured to whose rights it is subrogated. See also *Korda v. Chicago Ins. Co*., 2006 VT 81, ¶ 26, 180 Vt. 173. Whether the assignment of the claims serves as a defenses to the stated causes of action is separately discussed in this opinion.

given the opportunity to develop her factual case, *Zukatis v. Perry*, 165 Vt. 298 (1996), this matter has been pending for some time.   Motions for summary judgment are and may be used to determine whether genuine issues of material fact exist, warranting the need for a trial.  *Bennett Estate v. Travelers Ins. Co*., 138 Vt. 189 (1980); *Sykas v. Kearns*, 135 Vt. 610 (1978).  Non-moving parties who wish to contest facts properly asserted by affidavit or otherwise in a motion for summary judgment must file a statement of contested facts and present  references to admissible documents, affidavits or other admissible materials.  V.R.C.P. 56(c).

### A)  Stinson's VCPA Claims Against UMIC

**UMIC's 3/27/18 Motion for Partial Summary Judgment  (with subsequent party filings on 4/23/18; 4/27/18)**

**Stinson's 7/30/ 18 Motion For Summary Judgement (portion as to VCPA claims) (with subsequent party filings on 9/17/18; 10/1/18)**

**Stinson's 3/21/19 Motion For Additional Responsive Pleading to Address Additional Arguments for the Court to Consider on Application of the Consumer Protection Act (with subsequent party filings on 3/22/19 and 3/27/19)**

UMIC moved for summary judgment on VCPA claim on 3/27/18. It asserts VCPA claims cannot lie against an insurance company, and alternatively a VCPA claim can not be shown as a matter of law in this case even if such claims may be asserted against an insurance company.

Stinson in turn moved on 7/30/18  for summary judgment on the VCPA count against UMIC. He argues the VCPA can apply to insurance related transactions, and UMIC's underlying conduct, akin to first party insurance bad faith, is also actionable under the VCPA.

Long after the briefing period ran, Stinson filed a motion to file a sur-brief. The court denies the motion for file yet another brief.  The parties had ample briefing period that they fully used.  By the court's estimate (using "rule of thumb", or more precisely ruler measurement estimates) of the pre-3/29/19 briefs –  easily exceed 1500 pages of submitted motion materials to date.   To allow this sur-brief  would mean the court in fairness would have to allow other requested surbriefs. The court declines to extend and complicate the briefed issues even further after the parties have had fair opportunity**.  *Stinson's 3/21/19 Motion for additional briefs is DENIED.***

At least three initial issues are raised by the parties' motions.  First, is if the *Wilder v. Aetna Life & Casualty Ins*., 140 Vt. 16 (1981) VCPA exclusion of insurance contract matters is still viable in 2019.  Second, is whether Dylan Stinson has the standing to bring a VCPA claim.  Third is whether the VCPA's 9 V.S.A. section 2461(b)'s private cause of action, for alleged "damages or injuries as the result of any false or fraudulent practices prohibited by section 2453

[prohibiting "unfair or deceptive acts or practices in commerce."]" apply to the alleged conduct here. To the extent Stinson may have a claim, it does not involve the typical *Carter v. Gugliuzzi*, 168 Vt. 48 (1998) situation involving deceptive or misleading, statement, practice or omission occurring involving the purchase of a good or service (i.e., the HO policy), but UMIC's conduct <u>following</u> the sale of the HO insurance policy.

    1.    Are insurance transactions excluded from VCPA coverage under *Wilder v. Aetna Life & Casualty Ins.*, 140 Vt. 16 (1981)?

The first issue is whether the VCPA may apply to claims against insurance companies. In *Wilder v. Aetna Life & Casualty Ins.*, 140 Vt. 16 (1981), the Vermont Supreme Court stated:

> [T]he selling of an insurance policy is not a contract for "goods or services" within the meaning of 9 V.S.A. s 2461 allowing for civil penalties. Insurance cannot legitimately be labelled either goods or services **as the Legislature has defined those terms**. See 9 V.S.A. ss 2451a(b), (c)."

*Wilder*, (emphasis added). This conclusion was pre-ordained by the then existing statutory definition of "goods and services" contained in the VCPA.[2]

In 1985, 9 V.S.A. § 2451a was amended generally and the current definition of "goods" or "services" was adopted:

> (b) "Goods" or "services" shall include any objects, wares, goods, commodities, work, labor, **intangibles,** courses of instruction or training, securities, bonds, debentures,

---

[2]. In 1981, the VCPA had the following definitions:

> (b) "goods" means all tangible personal property chattel including motor vehicles and mobile homes when purchased primarily for personal, family or household use and not for commercial, industrial or agricultural use, and courses of instruction or training regardless of the purpose for which they are taken. The term includes chattels which are furnished or used, at the time of sale or subsequently, in the modernization, rehabilitation, repair, alteration, improvement or construction of real property as to become a part thereof whether or not severable therefrom. The term also includes merchandise certificates or coupons, issued by a seller, not redeemable in cash and to be used in their face amount in lieu of cash.

> c) "Services" means work, labor and services furnished for personal, family or household use (and not for commercial, industrial or agricultural use) in connection with the delivery, installation, servicing, repair or improvement of goods sold under contract work, labor and service of any kind rented or furnished by a person engaged in the business of seller which are for personal, family or household use and not for commercial, industrial or agricultural use."

9 V.S.A. § 2451a(b)&(c) (1981).

stocks, real estate, **or other property or services of any kind.** The term also includes bottled liquified petroleum (LP or propane) gas.

9 V.S.A. § 2451a(b)(1993)(emphasis added). This current definition is much broader than the definition in effect when *Wilder* was adopted. Our Supreme Court has oft stated that the VCPA is to be given a liberal interpretation. *Ianelli v. U.S. Bank*, 2010 VT 34, *¶ 9, 187 Vt. 644; Wright v. Honeywell Int'l, Inc.,* 2009 VT 123, ¶ 7, 187 Vt. 123, 989 A.2d 539 (the VCFA "is to be liberally construed to protect the public and encourage fair and honest competition"); *Elkins v. Microsoft Corp.*, 174 Vt. 328, 331 (2002); *State v. Custom Pools,* 150 Vt. 533, 536 (1988); *Carter v. Gugliuzzi,* 168 Vt. 48, 52, 716 A.2d 17, 21 (1998) (VCFA should be applied "liberally to accomplish its purposes").

In *Greene v. Stevens Gas Corp*., 2004 VT 67*,* 177 Vt. 190, the Vermont Supreme Court noted that the 1985 amendments to the VCPA left an open question as to whether the VCPA's c "goods" and "services" definitions categorically excluded insurance contracts and insurance transactions from VCPA coverage, resting its analysis on the narrower issue as to whether a VCPA claim might be recognized under the case facts, assuming the VCPA might otherwise apply.

The Vermont trial court judges have differed in their interpretation of the viability of the broad Wilder exclusion of insurance-related claims under the VCPA. Setting aside the issue of if a viable VCPA claim may be shown on the particular case facts (discussed *infra*), in reviewing the reported trial court decisions, three Vermont trial court judges have adopted the view that the 1985 VCPA amendments override the *Wilder* broad exclusion for insurance matters (*Blake v. Progressive Northern Insurance*, Docket 64-9-15Oecv, 2016 WL 1167746 (2/4/16)(Tomasi, J.); *Fish v. Allstate Ins. Co.*, No. S0056-03 CnCv (June 11, 2003) (Katz, J.) (holding that **Wilder** no longer dispositive and that Act applies to insurance); *Bertleson v. Union Mutual Insurance Company,* Docket No. 834-04 Cncv, 2004 WL 7325433 (11/22/04)(Norton. J.))[3] and one judge (albeit now a member of the Vermont Supreme Court) continuing to apply *Wilder. (Nautilus Ins. Co. v. Loomis,* No. 194-9-10 Oecv, 2012 WL 1144698 ( Feb. 29, 2012)(Eaton, J)).

The undersigned judge adopts the view that the 1985 VCPA amendments legislatively overruled the broad VCPA insurance exclusion of *Wilder.* As Judge Tomasi noted in *Blake, supra*, current language provides the "Legislature's significant expansion of the definition of matters covered by the CFA-from 'delivery, installation, servicing, repair or improvement' of "'tangible personal chattel'" to 'intangibles' and 'property and services of any kind,'". Judge Norton opined in *Bertleson*, "the term 'intangible' suggests that goods or services include incorporeal assets like insurance policies" citing Black's Law Dictionary. [4]

---

[3] In addition Judge Morris declined to apply a broad *Wilder* VCPA insurance transaction exclusion in one case, at the motion to dismiss stage. He declined to make the full analysis but noted the uncertainty as to the ongoing viability of *Wilder* and applied the Rule 12(b)(6) maxim that even "novel or extreme" claims are not subject to dismissal at the deferential Rule 12(b)(6) stage of a case. *Poirier v. Farmers Ins. Group*, Docket No.95-4-10 Oscv, 2010 WL 3384248 (8/18/10) (Morris, J.).

[4] Black's Law Dictionary 823 (8th ed. 2004) (defining intangible as "[s]omething that lacks a physical form; an abstraction, such as responsibility; esp., an asset that is not corporeal, such as intellectual property".

The requirement that this court apply the VCPA statute broadly and liberally in favor of consumers, also requires this result as the current language, and its references to "intangibles" is certainly broad enough to capture insurance contracts and transactions. Had the legislature wished to maintain VCPA protections for certain industries or activities it could have crafted the amendments in a more narrow fashion or included specific exclusions. As Judge Norton observed in *Bertleson*, another definition within § 2451a expressly exempts insurance from transactions involving "home solicitation sales" of goods or services. See 9 V.S.A. § 2451a(d)(5).

Applying the VCPA to insurance transactions is consistent with several other state court decisions, including those under similarly worded consumer protection acts. See, e.g., *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54–55 (Colo. 2001) (Colorado consumer protection statute applies to insurance); *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 925 (Tenn.1998)(insurance regulations of the Insurance Trade Practices Act do not foreclose the application of the Consumer Protection Act to insurance companies); *Lemelledo v. Beneficial Management Corp. of Am.*, 696 A.2d 546, 551 (N.J. 1997) (New Jersey consumer fraud statute applies to insurance in conjunction with loans); *Stevens v. Motorists Mut. Ins. Co.*,759 S.W.2d 819  (Ky. 1988)(allowing claims against insurers under the Kentucky consumer protection act, noting "Washington, Pennsylvania, Massachusetts, Texas and Illinois have held that insurance practices can give an insured a cause of action under their particular consumer protection acts against an insurer");  *Dodd v. Commercial Union Ins. Co.,* 373 Mass. 72, 365 N.E.2d 802, 806 (1977)(consumer protection statute and statute prohibiting deceptive practices by business of insurance have concurrent application to unfair or deceptive insurance acts or practices).

Thus the court concludes that the VCPA may apply to consumer transactions involving insurance policies.  That still leaves open the questions as to what insurance related transactions the VCPA may apply, and if the facts in this case, construed in favor of Stinson, allow a VCPA claim to proceed.

2.   Does Dylan Stinson have standing as a "consumer" under the VCPA, to assert these claims?

The VCPA's statutory provision for private causes of actions is found at § 2461(b). While any "person" who violates the VCPA may be subject to actions for civil penalties and injunctions in actions brought by the Attorney General (§ 2461(a)), § 2461(b), authorizing private suits, limits the claimant class to "consumers".

"Consumers" is a defined term under the VCPA:

"Consumer" means any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of his or her trade or business but for his or her use or benefit or the use or benefit of a member of his or her household, or in connection with the operation of his or her household or a farm whether or not the farm is conducted as a trade or business, or a person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of his or her trade or business but for the use or benefit of his or her business or in connection with the operation of his or her business.

6

§ 2451a(a). It is undisputed that Stinson had no involvement in the procurement of, or payment for, the UMIC Policy acquired by his mother. His mother acquired and paid for the policy, although he was a member of her household.

Stinson correctly notes that the VCPA does not require contractual privity for a plaintiff to assert a claim. *Elkins v. Microsoft, Inc.,* 174 Vt. 328 (2002). *Elkins* was in effect an antitrust class action claim, where the putative class were the ultimate purchasers of computers which allegedly had an overpriced operating system due to Microsoft's monopoly power. Under conventional antitrust jurisprudence, the antitrust claims of "indirect purchasers", such as the retail consumers, against the manufacturer, were subject to dismissal. (*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)). In considering the Vermont CFA claims, the Vermont Supreme Court in *Elkins* concluded that the state statute would allow the claims despite the absence of privity. The liberal remedial purpose of the statute, coupled with Section 2461(b)'s language, allowing affected consumers to recover from a solicitor or "other violator", supported such result[5]. The *Elkins* Court did not abandon or eliminate the requirement that the plaintiff show § 2461(b) "consumer" status, even though UMIC is incorrect that the VCPA requires that the parties have a "buyer-seller" relationship. (*See* fn 4, *infra*). However in the *Rathe Salvage Inc, v. R. Brown and Sons*, 2012 VT 18, 191 Vt. 284 case cited by UMICA, the salvage yard's effort to pursue a VCPA claim against a vehicle hauler was rejected because the defendant was paid no consideration and the claimant failed to establish that it was a VCPA "consumer" The Court noted the focus is "how [the parties'] transactions were carried out in fact and comparing those facts to the CFA's definition of 'consumer.'" 2012 VT 18, ¶ 29, In *Meehan, I v. Caponigro*, Docket 129-6- 03 Oecv, 2004 WL 5676396 (8/9/04), then Judge Eaton declined to extend *Elkins* to allow a VCPA claim against an attorney, broker, and surveyor to whom they never agreed, even indirectly, to pay consideration for goods or services, but who were involved in a related land transaction, as the claimants had no "consumer" status as to that transaction.

The Vermont Supreme Court recently reemphasized the "consumer" standing requirement in *Messier v. Bushman*, 2018 VT 93. In *Messier*, a plaintiff motorist action against defendant motorist and insurer for damages claimed to have been sustained in automobile accident, alleging negligence against defendant motorist and breach of Vermont Consumer Protection Act against the tortfeasor's insurer, The VCPA claim against the tortfeasor's insurer was based on the claim that the insurer had engaged in unfair claims settlement practices under the VCPA by extending two "low" settlement offers. Dismissal of the VCPA claim against the insurer was affirmed because the claimant failed to show "consumer" status, even if one assumed for argument's sake that a violation of the Vermont unfair claims settlement practices act might in some cases be actionable under the VCPA even though direct private causes of action under the insurance act are not recognized in Vermont . As the *Messier* Court stated, "[i]n order to

---

[5] Section 2461(b) allows covered consumers to not only sue "sellers" but otherwise undefined "solicitor[s], or other violator[s]" for VCPA violations. See also *Sawyer v. Robson*, 2006 VT 136, 181 Vt. 216)(mobile home park tenants need not show their landlords were a "sellers" to recover under the VCPA against the landlords as a "solicitor" or "other violator"). However § 2461(b) standing to sue is still reserved to "consumers".

recover under the CPA, a plaintiff must establish that they are a consumer. . . Here, Messier did not purchase anything from Travelers, who was Bushman's insurer. Further, he did not lease, contract, or otherwise agree to pay consideration to them for goods or services used in his household". 2018 VT 93, ¶ 25 (underlining added).

The plaintiffs in *Elkins* were "consumers" in that they had purchased the good or product which was the subject of the VCPA claim. Here, Stinson had no involvement in the marketing, sale, selection, or purchase of the UMICA Policy. He paid no consideration for the UMICA Policy. Facially Stinson is not a VCPA "consumer". Under the VCPA, as interpreted by the Vermont Supreme Court "consumer" status is a perquisite to bring a claim.

Stinson argues he should be afforded standing under the VCPA as an intended third party beneficiary of the UMICA contract his mother purchased. He fails to adequately show why third party beneficiary principles apply in the VCPA context under Vermont law. On the issue of private suit standing, Vermont law focuses on the presence or absence of the "consumer" definition characteristics – not whether the non-contracting party seeking to assert the claim may be effected by, or a potentially foreseeable victim, of the sued parties' conduct. To the extent unfair and low settlement offers might otherwise support a VCPA claim, the *Messier* Court recognized no rights for the tort victim, even though he would be a potential and foreseeable victim of unfair and deceptive acts and practices by an insurer who issues an auto liability policy.

For household members of "consumers" who purchase products and services, like Dylan Stinson, the VCPA's "consumer" definition provides express description of recovery right and who may pursue them. When Stinson's mother purchased the UMICA Policy for herself and members of her household living with her, her "consumer" status included the her right to recover as to goods and services she bought for herself, but also those she acquired for " the use or benefit of a member of his or her household". Had the legislature wanted members of a household to hold VCPA "consumer" status in their own right, this definition could have expressly included household members as "consumers" for goods or services acquired for their benefit by other persons in their household. The court need not ponder whether Stinson's mother might be able to pursue a VCPA claim, involving damages to her household members, based on the alleged actionable conduct of UMIC. She is not a party to this action.

Stinson's lack of standing under the above analysis would extend to the VCPA claims he seeks to assert under his request to amend the Amended Complaint (at pages 20 – 22 of his 10/1/18 Reply Memo, which amendment is opposed by UMIC (see UMIC Surreply memo of 10/5/19). As the requested VCPA amendment would be futile, the request to amend the amended complaint to assert those new proffered VCPA claims is denied.

***Based on the above analysis, as to the VCPA Count of the Amended Complaint, the court GRANTS UMICA's motion for partial summary judgment and DENIES Stinston's motion for summary judgment.***

### B) Stinson's Insurance Bad Faith Claims Against UMIC

**UMIC's 6/25/18 Motion for Summary Judgment (with subsequent party filings on 7/30/18 and 9/17/18)**

**Stinson's 7/30/19 Motion for Summary Judgment (as to portion as "Bad Faith" Claims)(with subsequent party filings on 9/17/18; 10/1/18; 10/5/18 and 10/12/16)**

Stinson and UMIC have asserted competing motions for summary judgment on the insurance "bad faith" claims as to UMIC's conduct regarding claim settlement opportunities and communications as to the Subrogation Action. This sort of action is sometimes characterized as a "third party bad faith action". The insurer payment that may be made in the underlying tort action is to a third party (the alleged victim of an actually or potentially insured incident involving the insurer's insured), as opposed to a "first party bad faith action" where the issue is the insurer's conduct in declining demands to pay its own customer (the insured) for a claim allegedly covered under the insurance policy (*See eg*., *Bushey v. Allstate Ins Co*., 164 Vt. 399, 402 (1995)).

In this case, there are many uncontested material facts common to both motions, but also some contested material facts. In deciding each motion for summary judgment, the non-moving party gets the benefit of the versions of contested facts (and reasonable inferences therefrom) in its favor. *Toys, Inc. v. F.M. Burlington Co*., 155 Vt. 44, 48 (1990). In analyzing the third party bad faith claim here Attorney Boylan served as Stinson's UMIC-provided counsel, to represent Stinson in the Subrogation Action. For purposes of the bad faith claim analysis Boylan was an agent of UMIC for whose acts and omissions (relating to the insurer's duties to its insured under the UMIC Policy) UMIC is responsible. See *Myers v. Ambassador Ins. Co. Inc*., 146 Vt. 552, 556 (1986) ("*Myers*").

The important undisputed and disputed material facts pertinent to the copying motions may be summarized as follows.

As noted, Boylan was hired by UMIC to represent Stinson in the Subrogation Action. Defense was provided under the UMIC Policy, which had a $300,000 liability coverage limit and had a clause allowing UMIC to control the defense of the tort claims. Ms. Graham was UMIC's representative with the sole and full authority to make settlement decisions, right up to the policy limits.

Independent of the Subrogation Action, Stinson had faced criminal charges arising out of the underling incident. He was represented in the criminal matter by Attorney Frederick Glover ("Attorney Glover"). No private (that is non-UMIC retained) counsel filed any notice of appearance for Stinson in the Subrogation Action.

On 10/26/09 UMIC's claim rep Walther sent Attorney Glover notice that Concord was asserting a pre-suit subrogation claim, and asked for return of a signed non-waiver agreement for UMIC to continue investigation. Per a later Glover email – Attorney Glover sent a signed non-waiver agreement in April 2010.

9

Per a 9/13/10 letter of Concord to Attorney Glover, Attorney Glover had told Concord he represented Stinson's parents in October 2009. On 9/13/10 Concord informed Attorney Glover of Concord's intention to pursue a $347,292.81 subrogation claims against "the Stinsons".

Attorney Glover forwarded the letter to UMIC in October 8, 2010 with an email, stating some views under the UMIC policy that coverage for the Concord claims might be limited to $500 damage for property damage; intentional acts might be excluded, and noting the Vermont law limiting parents' civil liability for the act their child. The UMIC rep emailed back promptly, describing the $300,000 policy liability limitation and stated the two would talk in 90 days.

After the Subrogation Action lawsuit was filed in September 2011, Attorney Glover wrote Attorney Boylan in June 2012. As part of the letter, Attorney Glover told Attorney Boylan that he (Attorney Glover) "would appreciate being copied on correspondence, filings and the like as I will independently be reporting from time to time to both Dylan and his parents." (Boylan Depo. Ex. 71).

No other communications occurred between Attorney Glover and UMIC from the time of that letter until at least after the verdict. To the extent UMIC assumed Attorney Glover was representing Stinson's personal interests as to the Subrogation Action as private counsel, UMIC (and Boylan) never made inquiry of Stinson or Glover on that topic.

When the Subrogation Action was filed Boylan was hired to represent Stinson in the action. Prior to the trial Boylan did not describe to Stinson, orally or in writing, the scope of his representation of Stinson, or make communications with Attorney Glover. Stinson believed Boylan was "his" lawyer for relevant purposes on the Subrogation Action, protecting his interests. The Stinsons were no longer using Attorney Glover for advice once the Subrogation Action was filed, but did not expressly inform UMIC or Boylan.

Aspects of liability and damages in the Subrogation Action relate to the pending motions. On liability, claims were asserted against Stinson for negligence and in essence, for vicarious liability for the acts of others, under "concreted action liability" (See *Gritman*, 2016 VT 45). In essence the Subrogation Action fire loss damages were ones resulting from a house fire that occurred after some trespassing teens had made an outdoor fire in a chimera on the house deck, and left the area after allegedly not making sure the fire was completely out. Stinson, who was one of the trespassers and present as the fire and blaze was underway, left before the other teens present made their final exit. This created some liability issues as to Stinson's liability on both counts. Liability was not certain.

On damages, in essence if liability was found, the recoverable damages would likely exceed the $300,000 UMIC Policy liability coverage limit. UMIC had noted $347,292.81 was being sought in September 2010.

The Subrogation Acton was fully litigated, going through discovery, a jury trial, and an appeal to the Vermont Supreme Court. The third party bad faith claim is based on alleged failure to properly settle the case.

Stinson was always the insured and a client of Boylan in his role as counsel. Stinson, a young man, expressed his personal view he had not done anything wrong and the claim should not be paid. Nothing indicates that Stinson (or Boylan or UMIC) checked with Attorney Glover as to his (Attorney Glover's) views on the matter of settlement. Stinson states had he known he

matter could have been settled within policy limits before trial  "I would have settled" if he knew it was possible.[6]   Stinson personally lacked significant assets to pay any significant excess verdict portion not covered by UMIC's policy.

Certain settlement negotiations occurred in the case.  It is undisputed that none of the details of those communications [1] were communicated to Attorney Glover at any time before the jury verdict (or at all); [2] were communicated to Stinson, except for some contested Boylan-to-Stimpson communications noted below.

 Pre-mediation communications between Concord's counsel and Boylan included Attorney Nuovo's 11/13/13 $300,000 policy limits settlement demand letter, reminding Boylan that Stinson would be liable for any verdict above $300,000 and describing the *Myers* case. These legal principles (excess verdict exposure and the Myers case principles) were known to Boylan as an experienced attorney who regularly handled civil litigation matters involving liability insurer-provided counsel).

Pre-mediation Concord request, to Boylan, to discuss pre-mediation settlement did not yield pre-mediation settlement discussions and Concord entered mediation with its unanswered $300,000 policy limits demand.

A mediation in the case occurred on April 21, 2014.  Stinson was not informed of the scheduling of the mediation, told he could or might attend, or aware that it was occurring as it was held.  The claim potential clearly exceeded $300,000 but UMIC assessed the claim settlement value below that sum, based on its assessment and liability projections of Boylan.

Boylan gave no formal recoverable damages assessment, although it is clear damages above $300,000, could be awarded. On liability he gave Ms. Graham an assessment that  there was a 65 to 75 percent likelihood of a verdict in Stinson's favor.  Ms. Graham, getting input from another UMIC claims person (Peter Heitman), analyzed the claim's settlement value at about $150,000 (Graham Depo).

Concord reiterated its offer to settle for some unspecified sum under the policy limits a few days after the mediation. That information, and all settlement communications to that date, were not shared by Boylan or UMIC with Stinson, his mother, or Attorney Glover.

Prior to trial, in May 2014, UMIC had offered $100,000, and while Concord stated it would settle for some figure between $200,000 to $300,000, Concord and UMIC's Graham (with her control-of-settlement), made no offers over $100,000. As noted, right up through  jury draw it is undisputed that neither UMIC nor Boylan reported or described **any** of the settlement communications to Stinson or Attorney Glover.   After the Subrogation Action was filed and prior to jury draw (or even later), neither Boylan nor UMIC informed Stinson that he could have personal exposure to an excess verdict, and should or might want to confer with counsel, or inquired if Attorney Glover was still representing him as to the civil claims from the incident.  It

---

[6] UMIC views this as a coached statement for this litigation and of course notes Ms. Graham solely controlled settlement. One thing the undisputed record reflects is certainly up to jury draw Stinson had no understanding, and received no advice or information, about excess exposure, settlement discussions or strategy, or the fact he might want to talk about the Subrogation Action to an attorney other than Boylan.

appears that Boylan recalls in one conversation with Stinson a few weeks before trial, Boylan recalls telling Stinson there was an unsuccessful mediation, but that was the only information he could recall being conveyed.

Boylan recalls one (contested) conversation with Stinson and Michele Stinson on the date of the jury draw. According to Boylan, he reported the "something [unspecified] less than $300,000" demand of Concord, the $100,000 UMIC offer; described there could be an excess verdict, for which Stinson would be liable, if the judgment sum was over $300,000; and received Stinson's response that he wanted nothing to be paid. No advice to consult with private counsel was given.

The next Boylan-recalled (contested) conversation occurred after jury draw but during a Boylan-Stinson trial preparation in-person meeting before trial started. Boylan told Stinson the settlement position had not changed and could not recall providing other information, advice or statements

Trial occurred May 20, 22 and 23, 2014. A verdict of $403,106.19 was returned, and later, an even larger judgment.

Stinson attended trial, as did his mother (at least for some or all of the trial).

Ms. Graham attended the first day of trial. One the first day of trial Ms. Graham spoke with Mr. Wheeler, the representative present for Concord, the subrogation claimant. Although the two representatives might have differently viewed how the trial appeared to be "going", Mr. Wheeler told Ms. Graham there was still opportunity to settle the claims within policy limits. (Graham Depo.)

That same day, Ms. Graham spoke to Stinson and his mother at some point when they were all together. Ms. Graham believes the discussion included some unspecified discussion of the case's settlement status, presumably what Mr. Wheeler had said. (Graham Depo). Stinson wanted little to do with the trial and not to see anything paid, per Ms. Graham.

Boylan recalled his (contested) conversation with Stinson that same day. Per Boylan the same settlement status was described ("less than $300,000" for Concord, $100,000 for UMIC), with Concord not willing to give a specific number. During all of these pre-verdict (mostly contested) conversations with Stinson before verdict, UMIC never told Boylan it stood ready to pay $150,000 for settlement (and the reasonable inference is he never asked), and Ms. Graham never told Stinson about her authorized, self-imposed discretionary settlement offer limit of $150,000. Boylan could not recall any excess verdict exposure discussion at this time.

The next conversation Boylan recalls having with Stinson was while the jury was deliberating its verdict and Boylan was at the court with Stinson and his mother. (It is pretty clear, or at least a jury question, whether information given at this time would be of limited utility/ usefulness to Stinson as far as changing the outcome of the then-imminent verdict of some kind). In this setting, Michele Stinson asked Boylan what would happen if the verdict was returned above the insurance policy limit. Boylan recalled in his deposition he would have discussed the appeal process, and if an excess judgment was upheld, the insured's (Stinson's) personal liability for the difference. Boylan advised Stinson if that occurred Concord would likely come to him to seek an assignment Stinson's bad faith claims against UMIC for what happened, and Concord would go after UMIC instead of him. He explained the bad faith "failure

12

to settle" concept behind such claims, "to make them aware of that".   The Stinsons recall the heart of this discussion, that they could or should sue Boylan or UMIC  for "bad faith" if there was an excess verdict upheld on appeal.

According to Ms. Graham, had Stinson or any counsel of his made any express demands of her (UMIC's agent with the settlement authority under the control-of-settlement provision) prior to the verdict to pay the UMIC Policy limits to settle the Subrogation Acton claims, she would not have done so.

After the verdict, Ms. Graham contacted Mr. Wheeler and offered $310,000 to settle the claims before appeal, but that was rejected.   (Graham Depo, page 157).

The central appeal issues were liability-based, and apart from interest calculation and computation issues (not impacting the excess verdict nature of any final judgment amount), left significant litigated liability issues until the Vermont Supreme Court upheld the jury's liability findings in 2016.

As Boylan states he advised Stinson on the day of the verdict, after the excess verdict was upheld, Concord approached Stinson to assign his claims involving the excess verdict liability. On July 25, 2016 Stinson assigned his third party bad faith claims (along with his claim against the Boylan Defendants as to Boylan's legal representation of him) to Concord.  Under the agreement Stinson agreed to cooperate with Concord as to its pursuit of the assigned claims and Stinson retained a right to recover 2/3rd of any recovery by Concord against UMIC and the Boylan Defendants, beyond described sums otherwise "owed to Concord", being the sum due to Concord under its Subrogation Action judgement, as well as other expenses.   Part of the exchanged consideration for the assignment was that Concord agreed not to seek to enforce against Stinson its final Subrogation Action judgment balcony still owed it, after credit for the UMIC Policy $300,000 policy limits payment received post-judgment..

*Legal analysis*

The Vermont Supreme Court recognized third party bad faith actions and discussed the applicable principles in *Johnson v. Hardware Mut. Cas. Co.*, 109 Vt. 481 (1938) and *Meyer, supra*, but has not further refined the guiding principles in later cases.

1.   *Johnson v. Hardware Mut. Cas. Co.*, 109 Vt. 481 (1938)

In *Johnson*, the insured tortfeasor's policy had a $5,000 per person and $10,000 per collision liability limit and a $5,000 property damage limit.  Following a claim asserted by five injured persons for bodily injury, and property damage, the insurer declined to accept a $5,500 settlement, and only offered $3,500.  The insurer declined to increase its offer, even though the insurer's adjuster (who attended the trial) and the insured strongly advised the company to accept the $5,500 settlement demand.  Further, the adjuster viewed the prospects of an excess verdict as "probable" but did not expressly so inform the home office.  A $14,500 verdict resulted.

The *Johnson* Court affirmed the subsequent bad faith verdict returned by the jury for the insured.  The Court described the fiduciary duties that arise for insurers involved in the litigation process. Liability insurers, who are paid a premium, implicitly undertake to use their control and management of the claim for the mutual benefit of the insurer and insured.  As the Court further explained:

> [The insurer] had a right to look after its own interests, but it was bound to have due regard for the plaintiff's interests, as well. If in what it did and refused to do it acted honestly and according to its best judgment, this suit must fail. If, on the contrary, it used its authority [to control the defense], to save itself from as much of the loss as possible, in disregard of the plaintiff's rights, consciously risking loss to the plaintiff to save loss to itself, the suit must succeed; for that would be bad faith, while its relation to the plaintiff demanded good faith. As applied to this case, bad faith on the part of the defendant would be the intentional disregard of the financial interests of the plaintiff in the hope of escaping the full responsibility imposed upon it by its policy.

109 Vt. at 491. A third party bad faith action requires the jury to find "intentional disregard" by the insurer, although the intent may be inferred from the circumstances. *Johnson*, 109 Vt. at 494; *Myers*, *supra*.

Vermont third party bad faith actions cannot be premised on a showing of mere negligent settlement practices by the insurer. In *Johnson*, the insured claimant's first suit for negligent claims handling was dismissed, but he was given permission to amend and assert "intentional disregard" style bad faith. See *Johnson v. Hardware Mut. Cas. Co.*, 108 Vt. 269 (1936). In affirming the final jury verdict, the Vermont Supreme Court, in its final 1938 opinion, found plenty of grounds to infer actual bad faith, despite the home office insurance company officials' self-serving testimony that they viewed the probable verdict to be within the insured limits. The *Johnson* insurer sought the insured's settlement contribution to a "below limits" settlement offer, contrary to its own procedures, and despite the lack of any coverage issue. The insurer-provided defense counsel urged the adjuster to meet the settlement demand, warning he feared a large verdict that would be a "whopper". Most telling for the Court was the adjuster's failure to communicate to the home office his opinion that an excess verdict was likely:

> Such probability, if reported, might well have caused the acceptance of the offer of settlement. The adjuster was the agent of the defendant and his knowledge and conduct were chargeable to his principal. Although he telegraphed to the home office, "if more details needed, wire immediately," no additional information was requested. Good faith required a full report of all facts bearing upon the matter of settlement and a decision based upon all such facts.

*Johnson,* 109 Vt. at 495.

2. *Myers v. Ambassador Inc. Co., Inc.*, 146 Vt. 552 (1986).

In *Myers*, an insured with a $10,000 policy limit was informed by its insurer that the claimant was initially seeking $15,000 in the complaint *ad damnum* clause and the insured chose not to retain private counsel. During discovery phases, settlement discussions in the range of $2,500 to $3,500 were entered into, but the plaintiff increased the demand to $9,000 shortly before trial, and then moved to raise the *ad damnum* to $300,000. The trial resulted in a $45,000 verdict, and the insured's resulting bad faith claim against the insurer was dismissed by the trial court.

On appeal, the Vermont Supreme Court reversed the trial court. Drawing upon its *Johnson* precedent, the *Myers* Court noted that the insured's surrender of control of management of the lawsuit (including settlement) up to the policy limits, imposes fiduciary duties on the

insurer as to its insured customer.  146 Vt. at 555.

The *Myers* Court recognized the "conflict of interest" between the company's desire to limit its own payment, and the insured's risk of an excess verdict, and opined that the insurer must weigh the risk to its customer when the verdict may come within, or beyond, the policy limits.  This is different than the first party bad faith standard, where once the insurer properly concludes proof of the customer's claim for the demanded sum is "fairly debatable", the insurer need not settle,  can risk that it may later have to fully pay the demanded sum, but avoid additional bad faith exposure. (*See*, *Bushey v. Allstate Ins Co*., 164 Vt. 399, 402 (1995) (discussing first party bad faith standards).  Although Vermont requires the factfinder to find the insurer had "intentional disregard" for the insured's interest, Vermont has not articulated any standard as to any minimum level of adverse judgment risk that may or need be shown to support such an inference of intentional disregard. Some courts, including ones that use a negligence-based standards, opine that bad faith may arise where the insurer refuses to settle within the policy limits while facing a "substantial likelihood" of an excess verdict.  As Vermont has not accepted a negligence approach to third party bad faith claims, the "substantial likelihood" of an excess verdict is merely a factor among others to consider.

*Myers* expanded and clarified Vermont third party bad faith jurisprudence in a few respects.

First, the insurer becomes responsible for the acts of the counsel it retained to represent the insured, as that counsel serves as an agent for the insurer as to aspects of the claim.   This can have ramifications in several ways. If the insurer expects its retained counsel to perform the acts to carry out the insurer's implied  duties of good faith, and that counsel does not do so, the insurer is responsible for the lapse in performing those duties.

Second the *Myers* Court explained the insurer's good faith conduct to include what may be viewed as the "procedural" aspect of the claims handling process, as opposed to the "substantive" magnitude of risk of an excess verdict.  *Myers* makes it clear that the claims communication process, and even the reasonableness of the insurer's investigation, play a role in third party assessing bad faith:

> The company must diligently investigate the facts and the risks involved in the claim, and should rely only upon persons reasonably qualified to make such an assessment. If demand for settlement is made, the insurer must honestly assess its validity based on a determination of the risks involved.  In addition, and more pertinent to this case, the insurer must fully inform the insured of the results of its assessment of the risks, including any potential excess liability, and convey any demands for settlement which have been made.  The insurer must be careful to give its insured full and accurate information as to settlement possibilities, for full disclosure allows the insured to assess whether he should move to protect his interests.  An insured who is kept informed may have further information to give to the carrier; he may use powers of persuasion upon the carrier to increase its offer; he may engage counsel; he may have other courses of action open to him.

*Myers*, 146 Vt. at 557 (quotation marks and citations omitted).  This *Meyers* duty to inform is is dynamic and ongoing.  "The insurer's duty to protect the insured is ongoing, and the insurer must inform the insured of significant developments as they arise."

15

Under *Myers*, an unfair <u>claims handling process</u>, as well as unfair <u>settlement offer position</u>, can be drawn upon as evidence to infer the insurer's intentional disregard of the insured's interests.  Under *Myers*, "[t]he question of whether an insurer acts in bad faith depends on the specific facts of each case, and is one for the trier".  146 Vt. at 577 (citing *Brown v. United States Fidelity & Guaranty Co.,* 314 F.2d 675, 680 (2d Cir. 1963)).  Yet such issue becomes one as a matter of law when "' from uncontroverted evidence a reasonable man following the law can draw but one conclusion on the issue.'"  *Id*, quoting and citing *Hodges v. Standard Accident Insurance Co.,* 198 Cal.App.2d 564, 574, 18 Cal.Rptr. 17, 23 (1962).

<u>Stinson's Motion For Summary Judgment</u>

Viewing the facts in the light most favorable to UMIC, the court assesses if Stinson has shown insurer bad faith as a matter of law.

Attorney Glover's communications with UMIC and Boylan create fact issues that UMIC may have believed Attorney Glover, after being informed an excess verdict might result, was representing Stinson's personal interests by monitoring the Subrogation Action proceedings, even if he did not co-appear as counsel for Stinson in the matter.

Even if triable issues of fact may exist on that issue (if Attorney Glover was representing Stinson  by monitoring the Subrogation Action, while not appearing as co-counsel of record)   in favor of UMIC, UMIC unmistakably failed to meet its *Meyers* obligations to keep its insured (or Stinson's putative counsel Glover) informed of settlement developments. Despite liability issues described below, the case posed excess verdict exposure.  Except for the disputed last minute conversations with Stinson on the eve of, or during, trial, the insurer failed to "fully inform the insured of the results of its assessment of the risks, including any potential excess liability"; "convey any demands for settlement which have been made"; or to "give its insured full and accurate information as to settlement possibilities".  Until the disputed conversations at the time of jury draw and thereafter, and despite the excess verdict exposure (even given Boylan's assessment as to liability) – UMIC acted in utter disregard of keeping its insured informed of settlement possibilities.  To the extent UMIC may claim it believed Attorney Glover was representing Stinson's uninsured interests, UMIC's failure to communicate with Attorney Glover more clearly shows this utter disregard.

While Stinson contends UMIC failed to make an adequate duty of investigation or assessment of the claim, Stinson has failed to show clear failings in these regards.   Through the criminal matter and investigation in the Subrogation Action, the essential facts of what occurred (and Stinson's role) and resulting fire losses exceeding $300,000 were fairly known and evident. The heart of the dispute, as to the claims against Stinson, was on liability, given Stinson's limited presence at the premises and involvement and participation in the fire. The jury's split verdict on the counts against Stinson, and the split appeal decision on the "concerted action" tort claim on these facts, show that, unlike *Myers*, there were substantial liability issues. [7]

---

[7] The fact Stinson pled nolo to the charges of unlawful trespass and setting a fire, bear little weight in assessing how UMIC handled the Subrogation Action settlement process.   The facts needed to show and prove Stinson's liability under the tort theories advanced differed from the criminal charges.  The facts surrounding the fire's genesis, and the degree of Stinson's participation in the events, posed legal issues if there were sufficient basis to hold Stinson liable

16

While UMIC relied in large part on Boylan's liability assessment that a defense verdict was likely, the issue is not whether Boylan's percentage-of-risk assessment was in retrospect accurate or even negligent. The issue on the bad faith claim is whether UMIC's reliance and use of Boylan's liability assessment and other information, along with other factors, supports a finding of intentional disregard by UMIC as a matter of law.

As noted the issue if the insurer displayed intentional disregard of the insured's interests is one weighed from the specific facts of the case. In viewing the facts in the light most favorable to UMIC the court cannot conclude as a matter of law that UMIC acted in intentional disregard by not settling the disputed liability claim for policy limits or otherwise before trial. While UMIC should have undoubtedly provided Stinson with more timely and complete information about his excess exposure, settlement prospects and settlement negotiations – it is not clear that had Stinson actively used private counsel, and personally or through counsel strenuously argued that the insurer needed to settle the matter, that intentional disregard of Stinson's interests would be shown by a refusal to settle for some sum demanded by Stinson.

In this court's view, the bad faith determination, and any inference of intentional disregard, considers both the procedural handling of the third party claim, and the substantive assessment as to its strength and validity on liability and damages. The combination of undisputed material facts and disputed facts favorable to UMIC leave triable fact issues for the jury to decide whether UMIC acted with the "intentional disregard" standard necessary to show insurer bad faith.

***Thus Stinson's motion for summary judgment on the third party insurance bad faith claim is DENIED.***

Before addressing UMIC's motion for summary judgment on the bad faith claims, the court must rule on a motion to amend the amended complaint (amend VCPA and bad faith claims and add breach of contract) that Stinson inserted into a reply memo

**Stinson's 10/1/18 Motion to Amend the Amended Complaint** **(Contained in his 10/1/18 Reply Brief) (with subsequent party filings 10/5/18 and 10/12/18)**

The court notes and addresses Stinson's 10/1/18 Reply Memo filing, at its Sections V and VI, asserts in part that Stinson is entitled to summary judgment against UMIC on his bad faith claim and/or to amend the amended complaint, due to UMIC's alleged breach of an insurance policy provision that the UMIC Policy coverage limits would not be valid against Stinson if his consent for post-judgment proceedings was not obtained and UMIC "continue[d] the suit by appeal or **otherwise**" (emphasis added) after "judgment is rendered against [the insured]". ("Consent to Continue Clause"). It is undisputed that the Judgment order was entered on or around August 24, 2014 and the Rule 59(e) motion to amend the judgment as a matter of law, or in the alternative for new trial, was filed 9/12/14, and without Stinson being asked to consent to the filing.

---

under negligence or concerted action theories for the fire that largely resulted from the careless actions of other teens.

The court does not see how invocation of an UMIC Policy provision, which appears to have been previously overlooked by the parties (and until now, Stinson's counsel) is probative (or at least determinative) on the "intentional disregard" issues as to UMIC. The court's decision to deny Stinson summary judgment on the bad faith count is not changed.[8]

The court does need to address the request, albeit buried in a reply brief, as a motion to amend the amended complaint, to assert a breach of contract claim. UMIC has objected to the request, mostly arguing the proffered new claim is asserted too late and the asserted new claim is obviously futile.

Turning to the futility argument first – UMIC has failed to explain how Stinson's breach of argument claims as to the "Consent to Continue Clause is obviously doomed, if they were to be otherwise allowed. Stinson invokes the insurance contract maxim that when an insurance contract can be reasonably interpreted in more than one way, the insured gets the benefit of the more favorable interpretation. He then notes that UMIC's contractual limitation liability waiver refers not just to appeals pursued without insured consent, but efforts to "otherwise" "continue the suit". The phrase is not clear. While UMIC's Subrogation Action motion for judgment as a matter of law would have terminated, not "continued" the Subrogation Action suit if successful, the alternative request for a new trial may be viewed as a motion to "continue" the Subrogation Action suit, by seeking an new hearing on the merits. The alleged breach of contract claim Stinson wishes to assert breach of the Consent to Continue" Clause, is not patently "futile".

Turning to the Rule 15 analysis, the court agrees with UMIC that the applicable Rule subsection is 15(a), not 15(b). While V.R.C.P. 15(a) states leave to amend should be "freely given when justice requires", and the case law instructs trial courts to be liberal in applying the Rule (*Lillicrap v. Martin*, 156 Vt. 165, 170 (1991)), the Supreme Court has provided guidelines in applying the Rule 15(a). The right to amend a pleading well into the litigation is not one of right. In determining whether to allow a party to amend its complaint, the trial court should consider four factors: "(1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party." *Perkins v. Windsor Hosp. Corp.,* 142 Vt. 305, 313, 455 A.2d 810, 815 (1982); *Hickory v. Morlang*, 2005 VT 73, ¶ 5, 178 Vt. 604; *Colby v. Umbrella, Inc.*, 2008 VT 20 ¶ 4, 184 Vt. 1.

~ "*Undue delay*" - There was some significant delay in filing the second request to amend the complaint. This action was filed in August 2016 and the request was not made until October 2018. UMIC has cited cases where courts have denied motions to amend brought well into the case proceedings. Federal case law, applying the same four-part test as Vermont, have noted that "undue" delay may be delay that is "extraordinarily long and unexplained" (*Johnson v. Educational Testing Service*, 754 F.2d 20, 27 (1st Cir. 1985)) and look for a " convincing explanation" for the delay. (*CL-Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158, 166 – 167 (S.D.N.Y. 1990). Many other cases note that "delay itself" is insufficient to deny leave to amend. See example, *U.S. For and on Behalf of the Martime Admin. v. Continental Nat. Bank & Trust of Chicago*, 889 F.2d 1248, 1254 (2d Cir. 1989); *Tefft v. Sewart*, 689 F.2d 637, 639 fn. 2 (6th Cir. 1982); *Hallas v. Ameriquest Mort. Co.*, 406 F.Supp. 1176 (D. Ore. 2005); *Upper Valley Ass'n for Handicapped Children v. Mills*, 928 F. Supp. 429, 433 (D. Vt. 1996).

---

[8] To the extent the 10/1/18 requested amendment would add additional VCPA claim contentions, those claims, even if considered would be futile under the "consumer" standing element analysis the court has laid out in discussing the VCPA claims.

Plaintiff's counsel has essentially stated that his attentions was focused on the VCPA, insurer bad faith and attorney malpractice claims thoroughly explored and briefed by the parties – and the potential breach of the UMIC Policy contract's Consent to Continue Clause – in a contract continuously available and viewable by all parties – was essentially overlooked.   Given the delay period, and the fact the new asserted claims was continuously discoverable, this factor weighs against allowing the amendment.

~ *Bad Faith* – The court finds no indication that Plaintiff has delayed filing the motion to amend the complaint was in bad faith. The proffered claim is one that could have been filed with the original complaint and assertion of the request was not the result of strategic or tactical decisions to gain some advantage that the court can discern. Its assertion now would not compromise the court's and parties to address the presently existing claims. This factor weighs in favor of allowing the amendment.

~ *Futility* – The court as already noted that the proposed claim is not one that is obviously futile.   Federal caselaw describing the futility factor describe this factor as relating to  claims that are "clearly insufficient or frivolous" on their face (*Enhance-It, LLC v. American Access Technologies, Inc*., 413 F. Supp.2d 626, 629 (D.S.C. 2006); *In re Boesky Securities Litigati*on, 882 F. Supp. 1371, 1379 (S.D.N.Y. 1995)), or lacking "colorable grounds" (*Hines v. City of Albany*, 542 F.Supp.2d 218, 224  (N.D.N.Y. 2008)[9].  Determination that the amendment is not "futile" under these standards is not the equivalent of concluding the claim will ultimately be meritorious or successful if allowed and heard.   This factor weighs in favor of  allowing the amendment.

~ "*Prejudice to the Opposing Party*" – The Vermont Supreme Court has not articulated the factors for assessing the prejudice issue.  Approaches taken by the federal courts applying the unfair or "undue" prejudice under F.R.C.P. 15  motions is instructive. The Second Circuit instructs federal district trial courts to generally consider whether the amendment would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction. *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 284 (2d Cir.2000) (*quoting Block,* 988 F.2d at 350).   The Third Circuit has measured prejudice under Rule 15 (a) as undue difficulty in prosecuting lawsuit as result of change of tactics or theories on part of other party;  or  a showing by the nonmoving party that it was unfairly disadvantaged, or deprived of opportunity to present facts or evidence which it would have offered had amendment been timely. See *Deakyne v. Commissioners of Lewes*, 416 F.2d 290, 300 (3rd Cir. 1969) (cited with favor in *First Nat. Bank of Boston v. Siberdick*, 146 Vt. 209, 2011 (1985); *Cuffy v. Getty Refining & Marketing Co*., 648 F.Supp. 802, 806  (D. Del. 1986).

It does not appear that litigating over the new proffered claim would require any significant expenditure of party resources or delay these proceedings.  In considering the new

_____

[9]  The *Hines* court explained, "[s]aid 'colorable grounds' requirement mandates that a district court may not deny a motion for leave to amend a pleading when said pleading is sufficient to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), which is to say, that colorable grounds exist."

offered claim here, it is facially fairly concise – the interpretation of a clause in the UMIC Policy. That insurance contract is certainly familiar to UMIC. UMIC is aware of the Consent to Continue Clause as it had Boylan send Stinson a 1/28/15 letter asking for the insured's permission to appeal the judgment after the denial of the Rule 59 post judgment motion to amend the judgment, or in the alternative, for a new trial. The applicable facts as to the claim and lawsuit events which may inform the interpretation of the contract clause in this case have been thoroughly explored by the parties. Any additional discovery relating to how the Cosnent to Continue Clause has been used, or its intended application, can be narrowly focused. If the requested claim is allowed to be pursued, it is unlikely to seriously delay resolution of this matter. The court notes that the time to complete discovery in this matter was set in the last scheduling order (4/11/18) at 1/31/19, and the motion was filed before that time ran. The pendency and complexity of the several motions, and lack of a more prompt decision on them, will very likely require some short extensions to discovery from the last formal scheduling order. (In fact in October 2018 the parties filed a request to extend the discovery completion date to 7/31/19, which request the court has not yet acted on but does as noted in this opinion). Moreover focused extensions of discovery when a new claim is added are commonly used to allow the responding party opportunity to respond to an amended pleading. In *Shahi v. Madden*, 2008 VT 25, ¶ 7, 183 Vt. 320, the Vermont Supreme Court cited and quoted *Perkins v. Windsor Hosp. Corp.,* 142 Vt. 305, 314, 455 A.2d 810, 816 (1982) for the proposition that "[a]ny surprise engendered by allowance of the proposed amendment could have been eliminated by requesting a continuance of the trial."[10].

There is nothing to indicate that the delay in the proffered claims assertion would impair UMIC's ability to present evidence to respond to the claim, due to the delay in the claim's assertion. It is true that allowing the amendment and a new claim may weaken UMIC's overall position in this matter, but as the *Cully* district court observed, "it is obvious that an amendment, designed to strengthen the movant's legal position, will in some way harm the opponent", but that fact is not grounds in itself to deny the request. *Cully, supra*.

The court concludes there is an absence of sufficient unfair or undue prejudice to UMIC for this factor to have significant weight against allowing the amendment. If the court allows a discovery completion extension, and appropriate time to defend against the claim before any trial date[11], there is no prejudice and then this factor weights in favor of amendment.

---

[10] In *Shahi, supra* a motion to amend the complaint, to add a defendant and six new causes of action, was filed six months before trial, and had sufficient detail for the Defendants to be on notice as to the new factual averments and legal arguments. The motion was not ruled on until one week before trial, when it was granted. The trial court's grant of the motion to amend was affirmed on appeal. In *Bevins v. King*, 143 Vt. 252 (1983) the Vermont Supreme Court found a trial court abused its discretion by denying a motion to amend an answer to allow a new affirmative defense where the defendants first became aware plaintiffs were relying on Article 2 of the UCC two weeks before trial, particularly where the trial court recognized it might allow a continuance had it granted the motion to amend.

[11] The court notes no trial date has been set, and in this county, with a single judge covering all three divisions and a 5 day jury trial requested, the parties will have considerable advance notice of the trial dates as they are set. The practical logistical and scheduling reality is that civil jury matters cannot be scheduled for the immediate next jury draw as the discovery completion dates conclude.

20

As the court weights the above factors, it also draws upon the *Bevins v. King*, 143 Vt. 252, 255 (1983) recitation of the "principle reasons underlying the liberal [Rule 15(a)] amendment policy", namely: "(1) to provide maximum opportunity for each claim to be decided on its merits rather than on a procedural technicality, (2) to give notice of the nature of the claim or defense, and (3) to enable a party to assert matters that were overlooked or unknown to him at an earlier stage in the proceedings". (*Bevins*, citing 6 C. Wright & A. Miller, Federal Practice & Procedure §§ 1471, 1473 (1971)). Given the lack of prejudice, the concise and clear notice as to the nature of the new claims, the "overlooked" rather than calculated or tactical scheming nature of the late claim assertion - the law's oft-stated preference to provide a "maximum opportunity" to hear claims on their merits prevails[12] and the amendment should be allowed.

***In weighing all of these factors, and applying Vermont's "liberal amendment policy", the court GRANTS Stinson's motion to amend the amended complaint to add the breach of contract count as to "consent to continue" contract clause.***

<u>UMIC's Motion For Summary Judgment (Bad Faith)</u>

Viewing the facts in the light most favorable to Stinson, the court assesses if UMIC has shown the absence of insurer bad faith as a matter of law.

As described above - and especially after one discredits the disputed Boylan-Stinson communications as the evidence is viewed in the light most favorable to Stinson – UMIC utterly failed in the procedural bad faith aspects and duties to keep its insured informed and involved in the settlement discussion process. UMIC knew that any Boylan assessment of the described probable defense verdict for Stinson in the Subrogation Action was forecast – not a guarantee – and the fire loss property damages paid, and any awarded interest – meant the matter had real excess verdict exposure for their insured. The fact that Stinson, a young man, discounted his own fault and expressed his own opinion that nothing should be paid to other for the fire losses on account of his behavior does not assist the insurer. That did not negate the fact UMIC was "bound to have due regard for the [Stinson's] interests" as well. *Johnson, supra*. The evidence viewed in the light most favorable to Stinson reveals that had UMIC or Boylan asked if Stinson had his own counsel, he would have replied Attorney Glover had ceased providing advice now that Boylan had been retained, and Stinson was looking to Boylan to understand his (Stinson's) legal rights and position.

Looking at the bad faith claim's substantive aspects – UMIC had its experienced counsel's liability assessment that a defense verdict was more likely than recovery for Concord. The known case facts, and latter jury verdict and appeal results help show, that Boylan was correct in assessing that liability was not clearly in Concord's favor.

UMIC's motion for summary judgment leans heavily on the argument that with the Boylan liability assessment, its adjuster Graham would have steadfastly refused to offer policy

---

[12] *Bevins, supra*; *Lillicrap v. Martin*, 156 Vt. 165, 170 (1989); *Northern Sec. Ins. Co. v. Mitec Electronics, Ltd.*, 2008 VT 96, ¶ 38, 184 Vt. 303 ; *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 4 , 184 Vt. 1; *Prive v. Vt. Asbestos Group*, 2010 VT 2, ¶ 12, 187 Vt. 280; *Gauthier v. Keurig Green Mountain, Inc.*, 2015 VT 108, ¶ 4, 200 Vt. 125; *LeClair v. LeClair*, 2017 VT 34, ¶ 27, 204 Vt. 422.

limits or any sum over her $150,000 authority. UMIC argues thus as a matter of law Stinson cannot show that a different result would have occurred even if he had been fully advised, consulted and informed. The court is not so sanguine on that issue. The *Johnson* Court upheld a bad faith verdict where the insurer's home office vice president and a claims manager assessed that the claim had a value within policy limits, and were never expressly told by the adjuster, that despite the fact things did not look favorable at trial, an excess verdict was "probable".

In addition, the duties of the insurer to inform, advise and consult the insured on settlement status in excess verdict situations would be completely eviscerated if the insurer could simply escape liability by steadfastly stating that nothing anyone could have said would have ever changed the mind of the insurer claim representative with settlement authority. The whole point of the imposing duties to communicate on the insurer is to allow the insured the opportunity to change the settlement course due to the conflicting interests of the insurer and its customer facing the exposure:

> An insured who is kept informed may have further information to give to the carrier; he may use powers of persuasion upon the carrier to increase its offer; he may engage counsel; he may have other courses of action open to him.

*Meyers,* 146 Vt. at 558. Another noteworthy factor in Stinson's favor on this point is UMIC never made any increased settlement offers above its initial $100,000 offer. Ms. Graham had authority of $150,000 but ever used it, and never tested the firmness of Concord's "somewhere between $200,000 and $300,000" position. UMIC was on notice that Concord realized liability issues were present, but UMIC did not explore the settlement gap. Had Stinson be fully informed of the situation (and the excess exposure he faced), he may have consulted it and re-engaged Attorney Glover, and the case may have resolved.

UMIC suggests the fact it had the right to control the defense (and any settlement offers made from the policy limits of the UMIC Policy) necessarily means it cannot be found to have acted in bad faith. For the reasons just stated, the court disagrees. Control of defense, where there is some excess coverage exposure, does not provide the right to isolate the insured from the settlement strategy and communications. This duty to the insureds exist even if the insurer as some good faith assessments an excess verdict is more likely than not to be avoided. Insurers who cavalierly preclude and exclude their insureds from settlement and excess exposure risk communications, rather than "be careful to give [their] insured full and accurate information as to settlement possibilities" (*Meyers, supra*) do so at their own risk if and when an excess verdict results.

The court concludes triable issues of fact exist in favor of Stinson such that UMIC's motion for summary judgment should be denied.

UMIC has also contended it is entitled to summary judgment due to the Stinson Claim Assignment, as Stinson no longer has any personal damages exposure to Concord. The court rejects this argument by adopting the view, expressed by the Second Circuit in *Pinto v. Allstate Insurance Co.*, 221 F.3d 394, 403 (2d Cir. 2000), that the insured's assignment of his or her bad faith claim against his insurer, to the excess judgment holder, in exchange for a covenant not to sue or release does not automatically extinguish the bad faith claim or render the excess judgment claim unenforceable. See also, *Gray v. Grain Dealers Mut. Inc. Co.*, 871 F2d 1128 (D. D.C. 1989)(describing as a "somewhat metaphysical contention" the insurer's position that the release rendered the assignment worthless upon transfer because the release extinguished the

22

basis of the assignment); *De Marco v. Travelers Ins. Co.*, 26 A.3d 585, 624 (R.I. 2011)("it is our view that Travelers should not now be able to avoid having to deal with Mr. DeMarco's suit for excess damages by claiming that it obtained a release for its insureds—and that therefore the insureds had no claims to assign to Mr. DeMarco—when the only reason the insureds were released from liability was that they assigned to Mr. DeMarco the very rights that he is now seeking to assert against Travelers.").

The Stinson Claim Assignment agreement did not include a classic covenant not to sue clause, but included in part a release of Stinson by Concord if Stinson "fully cooperates" with Concord as the agreement specifies. (Stinson Claim Assignment at Para. 5). To the extent UMIC may claim it is entitled to summary judgment on the grounds that a "release" always extinguishes a claim, but a "covenant not to sue" does not, under contemporary release interpretation case law at best that leaves an issue for trial. In Vermont the scope of a release is determined by the intentions of the parties. See *Investment Properties, Inc. v. Lyttle*, 169 Vt. 487, 497 (1999); *Economou v. Economou*, 136 Vt. 611, 619 (1979). Here the "release" clause was part of an integrated agreement whereby Stinson and Concord state their intent for Concord to pursue UMIC and recover its losses, with Stinson co-pursuing and joining in any recovery above the excess verdict (plus interest and cots) sum. The agreement's language does not support an interpretation that the contracting parties' intent was to extinguish the right to pursue the rights held by Stinson, as he obtained the conditional release.

While strictly speaking not part of the court's dispositive legal analysis, one cannot help but note that it would be ironic if UMIC escaped any liability for its purported bad faith when its insured used the very same self-protective tactic (assignment of claim) that UMIC's provided counsel advised Stinson the insured/client might wish to take if an excess verdict resulted.

UMIC also seeks summary judgment arguing that Stinson lacked any significant assets or income and effectively the excess judgment was not recoverable against him. The fact that Stinson may have effectively been judgment proof before the assignment, does not support summary judgment for UMIC. In *Meyers, supra*, the Vermont Supreme Court stated that where the insured shows the intentional disregard by the insurer sufficient to show bad faith refusal to settle, the "insured's damages are the difference between the judgment and the policy limit, plus interests and costs". Accordingly, whether the insured has personal assets or financial means to pay the excess judgment is irrelevant to the insured's right to collect damages. Insurance bad faith victims are not required to declare bankruptcy or continue their lives saddled by large judgments in the aftermath of insurer bad faith when it occurs. The Second Circuit, in *Pinto*, succinctly described the policy reasons behind such a conclusion:

> To allow an insurer to escape bad faith liability because its insured lacks the ability to pay an excess judgment would introduce a perverse and undesirable incentive into personal liability actions, discouraging rather than encouraging settlement. Such a rule would allow an insurer who has acted in bad faith to reap a windfall because its insured is of limited means, and would ignore the very real harm an excess judgment can work on an insured's credit and financial future.

221 F.3d at 403, citing *Dumas v. State Farm Mut. Auto. Ins. Co.,* 111 N.H. 43, 45, 274 A.2d 781 (1971); *Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 505–06, 223 A.2d 8 (1966).

Lastly, the court places no legal stock in UMIC's argument that it is protected from bad faith liability because Stinson stated he did not want the plaintiff in the Subrogation Action to be

23

paid anything. The desire and hope the plaintiff would recover nothing was shared by UMIC and Stinson, but misses the point. Particularly where the insurer controls the power to settle in an excess exposure setting – with that power comes the responsibility to use that authority in a responsible way balancing the competing interests of the insured and insurer, and making sure the insured was properly advised about excess exposure and the desirability to confer with independent counsel.

*Based on the foregoing, UMIC's motion for summary judgment on the bad faith claim is DENIED.*

### C) Stinson's Attorney Malpractice Claims Against Boylan

**Boylan's 6/5/18 Motion For Summary Judgment (with subsequent party filings 7/30/18; 9/17/18)**

**Stinson's 7/30/18 Motion For Summary Judgment (with Subsequent party filings on 9/17/19; 10/1/18)**

Stinson had an attorney-client relationship with Boylan, after Boylan was retained by UMIC to represent Stinson in the Subrogation Action. Both Stinson and Boylan move for summary judgment against each other. As is the case with the competing motions for summary judgment asserted by Stinson and UMIC on the bad faith claims, in deciding the attorney malpractice summary motions in turn, each non-moving party gets the benefit of the versions of contested facts (and reasonable inferences therefrom) in its favor. *Toys, Inc. v. F.M. Burlington Co.*, 155 Vt. 44, 48 (1990).

The competing factual assertions are essentially those recited above in the insurance bad faith claims discussion. Other additional undisputed or disputed facts are set out below. The nub of Stinson's claim is that Boylan breached duties of care as a lawyer in failing to communicate and properly advise Stinson on settlement, or to obtain settlement of the Subrogation Action claims within the $300,000 UMIC Policy Limits.

There is no dispute that Boylan failed to advise Stinson of settlement status and negotiations, or advise him as to the excess coverage exposure issues, until late in the proceedings (and even much of those brief discussions are contested). There is no dispute that Boylan failed to inform Attorney Glover of case developments (assuming Boylan assumed Attorney Glover was some "independent counsel" for Stinson, which is also disputed).

Boylan is correct that the consequences and viable claims that might arise out of this situation against Boylan require application of a different analysis than the insurer bad faith claim described above. Whatever role Boylan may have played as an agent for UMIC as to its carrying out its duties to its insured, that does not impose personal liability on Boylan under the bad faith claim. (See cases cited at page 5 of Defendant's 9/17/18 Joint Motion in Opposition to Plaintiff's Motion for Summary Judgment). The claims against Boylan are in his role as an attorney representing Stinson. The standards that apply are set out in the law:

To establish legal malpractice, a plaintiff must prove that (1) the attorney owed a professional duty of care to the client; (2) the attorney breached the duty; (3) the attorney's act

was a proximate cause of the client's injury; (4) and that the client suffered damages as a result of the injury.

*Sachs v. Downs Rachlin Martin, PLLC*, 2017 VT 100, ¶ 17, citing *Brown v. Kelly*, 140 Vt. 336, 338 (1981).

The attorney-client relationship here was one where Boylan was an insurer-provided (and paid) counsel for Stinson in the Subrogation Action. This relationship between the three parties (UMIC; Boylan; Stinson) has been characterized by many courts as a "tripartite relationship". A typical description is given in one Alabama case:

> When an insurance company retains an attorney to defend an action against an insured, the attorney represents the insured as well as the insurance company in furthering the interests of each. The nature of this "tripartite relationship" has been characterized as follows:
>
> > "In the insured-insurer relationship, the attorney characteristically is engaged and paid by the carrier to defend the insured. The insured and the insurer have certain obligations each to the other, as previously noted, arising from the insurance contract. Both the insured and the carrier have a common interest in defeating or settling the third party's claim. If the matter reaches litigation, the attorney appears of record for the insured and at all times represents him in terms measured by the extent of his employment.
> >
> > "In such a situation, the attorney has two clients whose primary, overlapping and common interest is the speedy and successful resolution of the claim and litigation. Conceptually, each member of the trio, attorney, client-insured, and client-insurer has corresponding rights and obligations founded largely on contract, and as to the attorney, by the Rules of Professional Conduct as well. The three parties may be viewed as a loose partnership, coalition or alliance directed toward a common goal, sharing a common purpose which lasts during the pendency of the claim or litigation against the insured."
>
> *American Mut. Liability Ins. Co. v. Superior Court for Sacramento County,* 38 Cal.App.3d 579, 591-92, 113 Cal.Rptr. 561, 571 (1974). It must be emphasized that the relationship between the insured and attorney is that of attorney and client. That relationship is the same as if the attorney were hired and paid directly by the insured and therefore it imposes upon the attorney the same professional responsibilities that would exist had the attorney been personally retained by the insured. These responsibilities include ethical and fiduciary obligations as well as maintaining the appropriate standard of care in defending the action against the insured.

*Mitchum v. Hudgens*, 533 So.2d 194, 198-99 (Ala. 1988). See also *Rogers v. Robson, Masters, Ryan, Brumand and Belom*, 392 N.E.2d 1365 (Ill. App. 1979); *Finley v. Home Ins. Co.*, 975 P.2d 1145 (Haw. 1998); *Swiss Reinsurance Amer, Corp., Inc. v. Roetzel & Andress*, 837 N.E.2d 1215, 1220 - 1221 (Oh. App. 2005); Douglas Richmond, *Walking a Tightrope: The Tripartite Relationship Between Insurer, Insured and Insurance Defense Counsel,* 73 Neb. L.Rev. 265, 270 (1994).

The court finds, and Boylan appears to concede, that Boylan owed a professional duty of care to Stinson. The aspect of that duty in controversy here is the duty to advise and communicate with client ancillary to the core litigation, not the performance with the requisite skill of the profession in the manner in which Boylan handled the underlying litigation in terms of filing pleadings and motions, conducting depositions, jury draw, presenting the defense at trial and handling the appeal.

While the court agrees with Boylan that the breach of an ethical code by a lawyer does not constitute negligence per se, the court adopts Judge Crawford's analysis in *the Technine, Inc. v. Simonds*, Docket No. S12102009, 2012 WL 10159250 (Vt. Superior Ct. 9/24/12) opinion, wherein, citing other authorities[13], Judge Crawford concludes ethical codes may be admissible on the standard of care in a malpractice action.

The Vermont Professional Conduct Rules include Rule 1.4 which states:

Rule 1.4. COMMUNICATION

(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these rules;
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

In this matter Stinson has identified an expert witness, Russell Hilliard, Esq. Attorney Hilliard is expected to testify in essence that Boylan, as an insurance-hired counsel for Stinson in an excess exposure situation, failed to meet the standard of care by properly advising Stinson of his potential personal liability for any excess judgment and/or advising Stinson to seek independent counsel, as well as keeping Stinson informed of settlement offers. (Plaintiff's 1/16/18 Answers to Defendant's Interrogatories and Requests to Produce, at pages 2 – 30).

Boylan does not appear to contest that his duties of care to Stinson included communicating settlement information. In opposing Stinson's summary judgment motion, Boylan's contested testimony shows some information was shared and provided at jury draw and during trial. Both parties would agree that as a result of the Subrogation Action trial and appeal Stinson was left liable for a large excess verdict. The main issue on the malpractice claim is if any negligence by Boylan was a proximate result of injury to Stinson.

---

[13] Besides non-Vermont caselaw, his cited authorities include the Reporter Notes, to the Vt. R. Prof. Conduct *Preamble and Scope,* which states: "under general principles of tort law, violation of a rule may be prima facie evidence of malpractice, and the rules are presumably admissible as evidence of the standard of care in a malpractice action."

The proximate cause element was discussed at some length in *Sachs, supra*:

> In Vermont, to demonstrate causation for a legal malpractice claim, a plaintiff must show that the attorney's "negligence was the proximate cause of the plaintiff's injury." *"Fleming v. Nicholson*, 168 Vt. 495, 497, 724 A.2d 1026, 1028 (1998). Proximate cause requires a plaintiff to demonstrate by a preponderance of the evidence that the attorney's act was a cause-in-fact of the plaintiff's injury. *Knott v. Pratt*, 158 Vt. 334, 336, 609 A.2d 232, 233 (1992) (addressing plaintiff's burden to prove that "but for" defendant's negligent conduct, plaintiff would have prevailed). That is, a plaintiff must prove it is more likely than not that, but for the attorney's negligent conduct, the plaintiff would not have been harmed. *Id*.; see also Restatement (Second) of Torts § 433B cmt. a (1965).

*Sachs*, 2017 VT 100, ¶ 19. In footnote 3 to the just cited passage, the Supreme Court noted that in the "specialized field of legal malpractice". "proximate causation . . . .**is** 'cause-in-fact'". 2017 VT 100, fn 3, quoting and citing *Roberts v. Chimileski*, 2003 VT 10, Para 15, 175 Vt. 480 (bolding added). The *Sachs* Court noted the "meshing of the two inquiries does not extend outside of attorney malpractice". *Id,* citing *Collins v. Thomas*, 2007 VT 92, Para 8 (a negligence vehicle operation claim where by contrast the Court noted causation required both "but-for" **and** proximate causation")(bolding added).

In *Sachs,* like here, the malpractice claimant had sustained an economic loss[14], but the issue was whether there was proximate cause between that loss and the alleged malpractice. In *Sachs*, the unmarried mother of a child delayed filing of her parentage action for about a year, and took on $15,000 in family loans, that she expected to have repaid, based on her counsel's advice child support would be due retroactively to the child's birth, even if the parentage action filing was delayed. The filing delay was advised, as the mother could make due through the loans, and the delayed filing, lessened the risk the father (who was not expressing interest in the child) might seek primary or joint physical and legal responsibility or a substantial amount of parent child contact. The claimant's lawyer later discovered that in fact such back child support awards were not available in *parentage* actions. As the parentage action was then filed the father refused to voluntarily pay back sums not legally due. *Sachs* was a bench trial and the trial judge found negligence but determined plaintiff failed to prove the negligent representation was a "cause-in-fact" as the evidence was equivocal if the plaintiff would have decided to file immediately if originally informed of the lack of back child support payments as of matter of right in parentage actions.

In analyzing the merged proximate cause / cause-in fact (or "but for") element, the *Sachs* Court found that the trial court erred in its causation analysis:

> The trial court concluded that "[p]laintiff has not demonstrated that she likely would have made any different decision, even if properly advised of the risks of losing support." This was not a correct statement of the law. Plaintiff merely needed to prove by a preponderance of the evidence that but for defendant's negligence, plaintiff would not have suffered harm. *Id.* That is a standard plaintiff satisfied here.

2017 VT 100, ¶ 27.

---

[14] For purposes of this portion of the analysis the court assumes the right to recover survived the Stinson Claim Assignment.

The *Sachs* case nicely summarized the cause-in-fact element in another negligent advice malpractice case, *Estate of Fleming v. Nicolson,* 168 Vt. 495 (1998):

> For example, in *Estate of Fleming*, the plaintiff alleged damages resulting from the attorney's failure to disclose a subdivision violation found during a title search. 168 Vt. at 496, 724 A.2d at 1027. We held that the attorney proximately caused the plaintiff's injury when the attorney failed to disclose information necessary for an informed decision-making. *Id.* at 499, 724 A.2d at 1029. Specifically, we noted that the attorney was the source of information for the plaintiff and that, absent this information, the plaintiff necessarily misapprehended his legal position. *Id.* In other words, the plaintiff's necessary reliance on the attorney's expertise was sufficient to establish causation.

*Sachs*, 2017 VT 100, ¶ 25.

In another negligent advice malpractice case *Powers v. Hayes*, 172 Vt. 535 (2001), the plaintiff estate sued a lawyer who had given estate planning advice to the estate's decedent on the eve of risky surgery. The lawyer knew the decedent had a large IRA fund that named the decedent's then ex-girlfriend as the contract-designated beneficiary. The lawyer failed to advise the decedent to change that beneficiary designation as the two made changes to the decedent's will to carry out decedent's expressed desire to leave all of his assets to his daughter. The Vermont Supreme Court reversed the trial court's dismissal for lack of proof of causation, and concluded that the circumstantial evidence was sufficient to show causation.

In this case, assuming Boylan's negligence, construing Stinson's testimony in the light most favorable to Stinson, Stinson essentially states if he was fully advised of the situation, "I would have settled far before trial if I knew it was possible." (D. Stinson Depo. At 61). In analyzing the "but for" cause-in-fact causation for Stinson, as compared to the plaintiffs in the other three cases, there is an important difference.

The lawyer clients in *Sachs, Estate of Fleming* and *Powers*, each had the power and clearly shown ability to make an immediate decision to avoid injury if they had been properly advised. If properly advised: [1] the *Sachs* claimant could have directed the parentage action be filed immediately; [2] the *Estate of Fleming* decedent could have declined to purchase the property with its cloud on title; and [3] the *Powers* decedent could have directed the IRA beneficiary to be changed.

Here Stinson lacked the ability to make any larger offer to stave off his excess verdict exposure. He lacked personal funds and the insurer held the duty to control settlement, and thus the decisions to offer UMIC's funds to settle the matter. If Stinson could show that he had the clear ability and power to make an "under $300,000" settlement if fully advised by Boylan of his excess verdict exposure, he would meet Vermont's "cause-in-fact/ but for" causation test without a secondary showing that it is also likely that he would have made a decision to spend that much of his funds. See *Sachs*, 2017 VT 100, ¶ 27.

But here, as to his negligent settlement advice attorney malpractice claim, Stinson needs to show that "it is more likely than not", but for Boylan's negligence, he would not have suffered the excess verdict. This requires for his malpractice claim that Stinson show it is more likely than not UMIC would have tendered a sufficient amount to settle the case within policy limits. This he has not done. The mere fact that Stinson has presented a viable right to pursue a bad

faith claim against UMIC (subject to UMIC's defenses) is not a present showing of facts that Stinson is more likely than not to have been able to cause UMIC to extend a settlement payment sufficient to settle the Subrogation Action. The mere existence and circumstances as to UMIC's fiduciary duty to Stinson, to balance its and his interests - which this court has decided under the third party bad faith claim case law allows the jury to consider if that duty was breached and whether to award damages - does not meet the causation element for the malpractice claim.

*Based on the forgoing, Stinson's Motion for Summary Judgment on the medical malpractice claim is DENIED and Boylan's Motion for Summary Judgment is GRANTED.*

**D) The Discovery Motions –**

**UMIC/Boylan's - PART I 5/18/18 Motion to Reconvene Depositions of Witnesses Improperly Instructed Not To Respond Under VRE 502 (with subsequent party filings 6/4/18; 6/13/18 -corrected version, and 6/13/18)**

**UMIC/Boylan's - PART II 5/18/18 Motion to Reconvene Depositions of Witnesses Improperly Instructed Not To Respond Under VRE 502 (with subsequent party filings 6/4/18; 6/20/18)**

**UMIC/Boylan's - PART III - 5/23/18 Motion to Preclude Improper Use of V.R.Evid. 502 At Future Depositions Relating to Plaintiff's Assignment of Claims to Concord (with subsequent party filings 6/7/18 and 7/2/8)**

**UMIC/Boylan's - PART IV - 5/25/18 Motion to Compel Production of Document Improperly Withheld Under VRE 502 Including By Attorney Glover Individually (with subsequent party filings 6/8/18; 6/11/18; 6/15/18 and 7/3/8)**

These discovery related motions seek more information about the Stinson Claim Assignment and communications preceding it. Among the objections raised are whether the information is relevant to an issue in the case.

Facially the Stinson Claim Assignment contract is lawful, clear in its terms and, from Stinson's perspective, appropriately protect him from ongoing liability, and signed after he reached the age of majority. To the extent UMIC and Boylan may be viewed as asserting the contract was void, because of undue influence or advantage was taken of Stinson in the circumstances that led him to sign to it – the court agrees with Stinson that UMIC and Boylan lack standing to raise such claims. The court adopts the reasoning of New York and federal courts applying New York common law, on this issue. *Cnty. of Tioga v. Solid Waste Indus. Inc.*, 178 A.D.2d 873, 874, 577 N.Y.S.2d 922 (3d Dep't 1991) (holding that a judgment creditor lacked standing to assert the affirmative defense of lack of consideration because it was a "stranger" to the underlying contract, and the affirmative defense was personal to the parties to the contract); *Am. Home Assur. Co. v. McDonald*, 182 Misc. 2d 716, 721, 698 N.Y.S.2d 436, 441 (Sup. Ct. 1999); *Shea v. Royal Enters., Inc.*, 2011 WL 43460, at *3 (S.D.N.Y. Jan. 6, 2011) (holding that a non-party lacked standing to assert the "Statute of Frauds" defense and challenge

the enforceability of lease agreement); *Tamir v. Bank of N.Y. Mellon*, 2013 WL 4522926, at *3 (E.D.N.Y. Aug. 27, 2013) (stating that "a non-party to a contract lacks standing to challenge an agreement in the absence of terms demonstrating that it is a third-party beneficiary"); *Hillside Metro Assoc., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 48–49 (2d Cir. 2014) (holding that a lessor lacked prudential standing to litigate whether liabilities were assigned under a purchase and assumption agreement because the lessor was neither a contracting party nor a third-party beneficiary under the agreement); *In re Motors Liquidation Company*, 580 B.R. 319 (Bnkry. S.D.N.Y. 2018)(stating "a non-party to a contract that does not contain unambiguous language manifesting an intent to make the non-party a beneficiary of that contract lacks prudential standing to litigate issues related to that contract"). See also *Wells Fargo Bank, NA v. Rutledge*, 230 So.2d 550 (Fla, App. 2017)(purchaser of property at a foreclosure sale lacked standing to assert the defense of forgery as to the note and mortgage the bank sought to enforce); *Bank of New York Mellon v. Rowley*, 338 P.3d 24 (table), 2014 WL 6772489 (CT. App. Kan.)(unpublished opinion)(third party, not a party to, or third party beneficiary, of a note and mortgage, lacked standing to raise defenses to that agreement); *Nelson v. Hamilton State Bank*, 771 S.E.2d 113 (Ga. App. 2015)(note maker lacked standing to assert defenses based on alleged claims or issues as to a different note involving his cousin and a bank as contracting parties).

Defendants initial arguments on these motions was that more information about the Stinson Claim Assignment and communications about it are relevant on the issue over whether the bad faith claim was fabricated. (See Defendants' 5/13/18 Part I motion, at page 2 stating their "reasonable belief" that "Concord took advantage of Stinson's situation, lack of sophistication and poor memory to create and obtain the Assignments" and further accusing Concord of "manipulating" Stinson. The court does not find allowing discovery on this issue is relevant. This court has ruled that, *<u>even accepting all of facts in the light most favorable to UMIC and Boylan,</u>* and crediting all of their alleged advice and communications to Stinson about settlement, excess exposure, etc. – UMIC is not entitled to summary judgment. In the court's view, that ends that discussion.

Moreover there is ample evidence that Stinson's decision to assign any bad faith claims did not have its genesis in some post-judgment collusion or barratry by Concord, and suggestions to the contrary are speculation. According to Concord's own provided counsel, Boylan, while the jury was completing its fateful deliberations (and Stinson had no viable temporally reasonable means to seek independent advice[15]), he laid out the essence of bad faith claim assignment, and its advantages to Stinson. Boylan Depo pages 40-42. That advice forewarned Stinson that if there was an excess verdict that was upheld on appeal, after UMIC paid the policy limit, the plaintiff could look to Stinson for the rest; but in "reality" Stinson would be approached by the insurer to make a deal to assign his right to that claimant insurer so they

---

[15] In describing this advice, which occurred on the immediate cusp of receipt of the verdict, Boylan stated he did not inform Stinson of the then existing, (which in reality, was at best ephemeral), possibility of settling the case before the verdict was announced. See Boylan, Depo. Page 41, lines 20-23)

"would not come after" Stinson.  Boylan also testified he used the term "bad faith" in describing this process to Stinson.

Boylan needed not be a soothsayer to predict those future events if a large verdict was returned.  The insured's assignment of any potential third party bad faith claim  against the liability insurer, in excess verdict situations, is a commonly accepted practice and a rational protective response for an insured facing personal liability for  the unpaid portion of a judgment entered in excess of the insured's liability coverage limits.  See *Litigation and Prevention of Insurer Bad Faith, Third Edition*, § 7:2.Actions by third parties—Assignment, stating "[e]very jurisdiction in which the courts have addressed the question allows the insured to assign its right to sue the liability carrier for bad faith to a third-party claimant", citing as example jurisdictions *Moutsopoulos v. American Mut. Ins. Co.*, 607 F.2d 1185, 1189 (7th Cir. 1979) (applying Wisconsin law); *Murphy v. Allstate Ins. Co.*, 17 Cal. 3d 937, 942, 553 P.2d 584, 587, 132 Cal. Rptr. 424, 427 (1976); *Scroggins v. Allstate Ins. Co.*, 74 Ill. App. 3d 1027, 393 N.E.2d 718, 720 (Ill. 1st DCA, 2d Div. 1979); *Gallegos v. Malco Enters. of Nevada, Inc.*, 127 Nev. 579, 255 P.3d 1287, 1288 (2011); *Allstate Prop. & Cas. Ins. Co. v. Wolfe*, 629 Pa. 444, 456, 105 A.3d 1181, 1188 (2014) (answering certified question, Pennsylvania Supreme Court stated: "We conclude that the entitlement to assert damages under Section 8371 [Pennsylvania's bad faith statute] may be assigned by an insured to the injured plaintiff and judgment creditor such as Wolfe. Having answered the certified question, we return the matter to the Third Circuit."). *see, e.g.*, *Gray v. Grain Dealers Mut. Ins. Co.*, 684 F. Supp. 1108, 1111, 1113 (D.D.C. 1988), aff'd with opinion, 871 F.2d 1128 (D.C. Cir. 1989); *OK Lumber Co. v. Providence Wash. Ins. Co.*, 759 P.2d 523, 525 (Alaska 1988) (dicta); *Alfiero v. Berks Mut. Leasing Co.*, 347 Pa. Super. 86, 500 A.2d 169, 171 (Pa. Super. Ct. 1985); *Kagele v. Aetna Life & Cas. Co.*, 40 Wash. App. 194, 698 P.2d 90, 93 (Wash. Ct. App. Div. 3, 1985)).  See also,  Casualty Insurance Claims, § 18:16 - Bad faith allegations to induce settlement—Assignment of insured's claim for bad faith (2018) (stating "[w]ith rare exceptions, it has been generally accepted that such an assignment [i.e., the assignment of a bad faith claim by a defendant insured against defendant's insurer], given with consideration (that the insured defendant will not be held personally responsible for any verdict in excess of his policy limits) is legal and will be enforced".

As one well respected insurance treatise has explained:

> Especially in cases of alleged bad faith in failing to settle a third-party claim, assignment of the bad-faith action may serve to protect the insured from personal liability. It is a common practice, in such cases, for the third-party claimant who obtains a judgment or, in some cases, reaches a settlement with the insured for an amount in excess of the policy limit, to assign the insured's bad-faith claim to the third party in exchange for the third party's agreement not to enforce the judgment against the insured.

*Couch on Insurance*, § 204:1 - Cause of Action as Assignable (Third Edition. 2018).

Other facts showing the Stinson Claim Assignment, and assignment of any bad faith claims to Concord, had the normal and proper genesis are laid out in Stinson's June 8, 2018 response to the Part IV compel motions.  They include Boylan's 6/13/14 letter to Stinson (Ex.

52), telling Stinson that Attorney Nuovo wished to speak to him about assigning the bad faith claims, and suggesting Stinson speak to an attorney; Attorney Nuovo's 6/17/14 email to Attorney Glover, (Ex. 72), forwarding prior settlement demand letters and stating Nuovo's "interest in knowing if Mr. Stinson was ever made aware that we agreed to settle the case for the policy limits"; Attorney Nuovo's 9/4/14 letter to Boylan, referring to his consultations with "Mr. Stinson's private counsel", as to the bad faith claim matter or background, and describing the essential basis, on which letter Attorney Glover was copied; Attorney Nuovo's 1/28/15 email to Attorney Glover (Exhibit 72), sending a draft letter to Boylan, regarding the failure to settle, noting it had "representations about what you have told me" and asking for confirmation as to the accuracy of the statements attributed to Attorney Glover and Stinson; Attorney Jones' 1/29/15 response email (Ex. 72) passing along the information that Attorney Glover would need time to respond in part because "he will need to have his clients come in to discuss them"; Attorney Glover's 2/4/15 email Attorney Nuovo (appears to be part of Exhibit 72), noting Attorney Glover had spoken to Michelle Stinson and she advised that the 3 communications regarding settlement contained in the draft letter were accurate; Attorney Nuovo's 2/6/15 letter to Boylan, again referring to confirmation from Stinson's attorney that Stinson was not informed of certain offers of settlement, and again describing the essence of the bad faith claim, on which letter Attorney Glover was copied; Attorney Nuovo's 4/26/16 email to Glover (Ex. 72), updating Glover, and describing an outstanding request for UMIC to pay the claim, or whether the "next step" of filing the bad faith claim may be necessary; Attorney Nuovo's 5/23/16 email to Attorney Glover, informing him of the then current $345,000 unpaid judgment sum still due, and that he was trying, and hoped to resolve the balance with UMIC "without involving Mr. Stinson", and saying if it did not resolve, Attorney Nuovo would be in touch with Attorney Glover; Attorney Nuovo's 5/23/16 email (Ex. 63) to Boylan, wherein Nuovo states he has been informed "[t]hrough his private counsel" that Stinson intends to cooperate with Concord to pursue a claim for bad faith; May 25, 2016 emails between Attorneys Nuovo and Glover (Ex. 72) , wherein the motion to reargue and ongoing Nuovo attempts to settle are reported and Attorney Glover states his hope that UMIC "will pay" and resolve the matter; Attorney Nuovo's 5/6/16 email to Attorney Glover (Ex. 72), where Attorney Nuovo reports the lack of settlement and asks that arrangements be made for Stinson to discuss and possibly sign an assignment , and referencing the Nuovo/Glover prior discussions about Concord "assisting" Glover with his post-assignment fees, and seeking to work out those terms; Attorney Glover's 5/30/16 email to Attorney Nuovo (Ex. 72), stating Glover had spoken to Stinson before and Glover recalled Stinson was interested in assigning his claims to Concord to avoid execution of the judgment, and stating Glover's intent to re-confirm with Stinson, and noting Attorney Atken (UMIC's prior counsel in this matter) was trying to contact Glover in addition; two 7/6/16 emails from Attorney Nuovo to Attorney Glover (Ex. 72), forwarding the then draft assignment agreement, and suggesting it can be used to facilitate a meeting with Stinson abut the assignment; a 7/11/16 email from Attorney Glover to Attorney Nuovo, wherein proposed changes and revisions to the agreement, following Glover's discussions with Stinson and Michele Stinson about the agreement, and noting the Stinsons were generally agreeable to moving forward on the agreement, were ready to meet and Stinson wanted to get an explanation of what would be

32

expected of him[16] (the court notes the final contract, and presumably this draft, had a cooperation clause, which would be an expected and typical provision in a claims assignment agreement); a 7/12/16 email form Attorney Nuovo to Attorney Glover, forwarding agreed to edits; two 7/12/16 emails between Attorney Glover and Nuovo to arrange a meeting between Nuovo and the Stinsons; 7/13 – 7/15/16 emails between Attorneys Nuovo and Glover, finalizing a meeting for Nuovo and the Stinsons, and preparing and forwarding Glover a final clean copy of the then Glover-approved assignment agreement Stinson would be asked to sign).

Further given that the Subrogation Action UMIC claims handling and litigation result yielded a large excess verdict – Stinson  and Concord had a shared  or overlapping common interests in properly having that sum paid to Concord, even by someone other than Stinson, and Stinson eliminating his judgment collection exposure. The ensuing communications between Nuovo and Glover, largely summarized above,  seeking to advance those interests, through the commonly accepted bad faith claim assignment mechanism, are entirely proper.

Stinson's lack of legal sophistication does not change the analysis. He signed Stinson Claim Assignment clearly after consultations with private counsel (Glover) and had the post-assignment pleadings prepared by his joint litigation counsel with Concord (Nuovo).  As noted, this court finds, <u>even taking UMIC's factual version</u>, viable bad faith claims exist. The fact Stinson might not understand the exact nature of those claims or their full factual basis, is no hint of fraud or overreaching in his entering the Stinson Claims Assignment.  Vermonters regularly sign much more complex agreements, to further their personal or financial affairs (such as car loans, home mortgages; contract guarantees; credit card applications; deeds which bind the signer to common interest community declarations).  Nor does the fact that Stinson was unaware of the factual basis for some of the legally conclusory[17] assertions in the amended complaint evoke any air of impropriety in the pursuit of the claims.   Unsophisticated litigants may lack person knowledge or understanding of the pleadings their counsel prepare.  Here the claim was filed by Stinson's post-assignment counsel of record (Nuovo) and the court has found the facts present a viable bad faith claim.

The court finds Stinson's deposition testimony to the effect that his conversations with Boylan or Ms. Graham have "come up over and over again", and he has "gone over it again and again" to not forget it, which he stated  "kind of imprinted" the memories in him now (Stinson Depo., page 34), do not lend support to anything being amiss.  Defendants provide no indication other than that Stinson  directly discussed, or was asked as about, his recall of any Graham/ Boylan settlement information discussions, by Nuovo ( except for Stinson's discussions Attorney

---

[16] At his deposition Stinson stated his conversation with Attorney Nuovo, as the lawyer-prepared and reviewed assignment agreement was signed, was about "cooperating with them to make this case and make this case", so both sides could help each other, with Stinson understanding he would be protected from the unpaid judgment portion. (D. Stinson Depo., Page 82).

[17] Under *Johnson, supra* and *Meyers, supra*, the "intentional disregard" phrase in the Amended Complaint is a legal formulation of the ultimate conclusion a fact finder may draw from all  of the circumstances surrounding a bad faith claim.

Glover or Michelle Stinson), prior the assignment being given. Stinson's conversations on the topic preceding the assignment involved Attorney Glover and/or Michelle Stinson.

It would be not only usual, but part of the Glover's duties to understand the nascent bad faith claims under review and final assertion, to discuss with Stinson his recall of his Ms. Graham and Boylan settlement-related communications before those claims would be pursued. The record reflects Glover discussed those matters with Stinson before the assignment document was signed. At deposition, Stinson stated he had gone "over and over" his memory of the 2014 trial conversations with his mother and Attorney Glover. (Stinson, Depo. Page 34-35). The fact such consultations, on the topic of Stinson's memory of any settlement discussions with Boylan, occurred is reflected in the emails recited above.

It would also be understandable for Stinson to have discussed his recall of the trial-related Graham/Boylan settlement communications with his mother, as she was also present for much of the trial. She has been deposed and can provide any information she might have as to her non-privileged discussions with her son, as to their joint recall, that might have impacted his recall of the trial events. (See discussion of the Michele Stinson's involvement on attorney-client privilege waiver issue, *infra*)

At the nub of things, as to the 214 Subrogation Action settlement-related conversations - there is really not much to even recall. Boylan and Ms. Graham have recall of just limited settlement-related conversations with Stinson. For the very limited settlement-related conversations Ms. Graham and Boylan state they had with Stinson - for almost all of those conversations Stinson did not deny them but stated a lack of recall: Depo. Page 29 Lines 1 to 10 (may have met Ms. Graham the first day of trial, can't recall anything she may have said if they met); page 29, lines 12 to 24 (not recall any conversations with Boylan on days 1 or 2 of trial, noting in part "its been four years ago", and as of the 2/16/18 deposition date "I never dreamed I'd still be dealing with this"); page 29, line 25 to page 30, line 12 (recalled being present with his mother and Boylan the third trial day and Boylan stating at some point that after appeals a bad faith claim against him could be brought, not understand the term at that time); page 31, 2-5 (no recall of discussions with Boylan about a bad faith claim's basis but "I could be wrong"); page 63 (lines 2 -23)(recalls the day three Boylan conversation may have been a pre verdict options if it happened or a post verdict options now, otherwise not remember conversation'; and agrees it could have been during jury deliberations).

Additionally Stinson's memories as to those 2014 events would undoubtedly have been thoroughly (and properly) discussed and reviewed again by Stinson with his litigation counsel in this matter (Nuovo) before Stinson gave his 2/16/18 deposition and referenced "imprinting".

The term "imprinting" can only be viewed as a reference to what would be a typical difficulty of a witness, while testifying under oath, to separate his or her <u>present</u> memory and recall of the events four years prior, from <u>succeeding</u> events. It can be difficult to separate one's present recall of a temporally distant event, from the unavoidably overlapping intrusion upon

34

memory of more recent memories – namely more recent times and sessions where a witness is appropriately asked to describe and recall the original, distantly temporal events in as much detail as can be made.

There is nothing but raw speculation – to suggest that Stinson might have been prodded by Attorney Glover or Attorney Nuovo to forget details of actual 2014 trial conversations, or been subject to anything other than their inquiries asking him to remember what he remembers. *Mattoon v. City of Pittsfield*, 980 F.2d 1, 8 (1st Cir. 1992)(denying Rule 56(f) to permit a party more discovery where no plausible basis exists for asserting a belief that specified discoverable facts probably existed). As noted below, beyond the Michelle Stinson privilege waiver issue discussed below, Stinson's communications with Attorneys Glover and Nuovo were covered by attorney client privilege. Where it is pure speculation that the communications involved "anything but" communications relating to the seeking of legal advice and services, discovery may be denied. See example *Nishika, Ltd. v Fuji Photo Film Co., Ltd*., 181 F.R.D. 465 (D. Nev. 1998)(denying production of a letter, relevant to a contract issue, involving plaintiff's two lawyers where it was "pure speculation that the letter contains anything but directions and requests regarding counsel's preparation of a legal document. That is the seeking of legal advice and services."). The court does not find the requested discovery discoverable on the theory Stinson was manipulated into giving false testimony.

Moreover, Defendants' contention that Glover and or Nuovo created the bad faith claim by falsely manipulating Stinson's prior 2014 settlement discussion recollection- if true would be a serious fraud on the court. Vermont's lawyer client privilege, at Rule 502(d)(1), has an exception for communications where the lawyer of the client enables or aids what the lawyer reasonably should have known to be a fraud. Federal courts, in applying the common law crime-fraud exception have stated that, to overcome the attorney-client privilege under the crime-fraud exception, a party seeking to show the waiver must make a sufficient showing. This may be done by presenting prima facie evidence that " 'gives color to the charge' by showing 'some foundation in fact'" (*United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007), quoting *Clark v. U.S.*, 289 U.S. 1, 15 (1933)); or providing grounds to find "reasonable cause to believe that the attorney's services were utilized in furtherance of an unlawful scheme (*In re Grand Jury Proceedings*, 87 F.3d 377, 382 (9th. Cir. 1996); or by "probable cause to belief that a crime or fraud has been attempted and the communications were in furtherance thereof" (*In re Richard Roe, Inc.,* 68 F.3d 38, 40 (2d Cir. 1995). See also, *U.S. v. Zolin*, 491 U.S. 554, 572 (1989)(to obtain *in camera* review of privileged materials claimed to be subject to the crime-fraud exception, there must first be a showing "of a factual basis adequate to support a good faith belief by a reasonable person" that the exception applies). As the Ninth Circuit has explained the reason the party seeking the information should be required to make a showing, for production of communications that are made in the attorney-client context, is that to allow a "mere sneaking suspicion" to invade the privilege, the result would be to "discourage many would-be clients from consulting ant attorney about entirely legitimate legal dilemma". *In re Grand Jury Proceedings*, 87 F.3d at 381.

The court finds the federal cases' approach, and underlying policies, persuasive. The court does not find a sufficient showing here to seek discovery of materials on the claim that there is fraud afoot.

Returning to the Subrogation Action Graham/Boylan – Stinson settlement discussions, the possibility exists Stinson and his mother at some point exchanged their recalls and Stinson's memory might have been affected by any incorporation by him of his mother's memory (of the lack of settlement-related discussions in her presence) into his own statements of what Stinson recalls. Ms. Stinson can be deposed as noted.

The court does not view Defendants' later asserted contention, that they are just seeking facts as to the basis for the bad faith "claim", to change the result. Like any suit, the suit "claim" here was filed and based upon the then available information, including the collected information as to Stinson's and Michelle's Stinson's then best memory of what they recalled occurred. The "claim" as it is presented at a trial, will be based on what the witnesses to the events may then recall, with their trial testimony subject to refreshment or impeachment by prior versions of how they may have described the events. As one Pennsylvania court explained:

> Where a witness has observed an occurrence and formed an impression thereof, the fact that, at the trial, due to the passage of time and the fading of memory, she is not able to state with positive or absolute certainty Exactly what she observed, but only what "I think" or "I vaguely remember" occurred, will not preclude the introduction of the witness' testimony.
> "The deficiency comes merely in the quality of h(er) recollection . . .. (T)he law makes no objection on such grounds. It welcomes whatever quality of recollection (the witness) is able to bring."

*Commonwealth v. Stickle*, 398 A.2d 957 (Penn. 1979), quoting 2 Wigmore on Evidence 658 at 768 (3d ed. 1940).

As the court views the situation, the potentially relevant information at stake would be solely evidence of other statements Stinson may have made, outside of statements covered by attorney client privilege, relating to Stinson's memory of any settlement-related communications he had with Ms. Graham or Boylan. Prior non-privileged statement by Stinson on such topic would be relevant and might be used to impeach Stinson's deposition or trial testimony in this case.

Setting aside Stinson-lawyer meetings where Michelle Stinson was present (raising privilege waiver issues) – it appears Stinson's consultations with Attorney Glover, and even statements to Nuovo as the final Stinson Claim Assignment, were covered by the privilege. The exact moment Stinson was retained by Nuovo is not determinative. The privilege includes as the covered "client" a person who "consults with a lawyer with a view of obtaining professional services from him". Vt. Rule Evid. 502(a)(1). The privilege also covers communications "made for the purpose of facilitating the rendition of professional services to the client." Rule 502(b). The assignment document included Nuovo co-representing Concord and Stinson after the

36

agreement was signed, and discussions about what Stinson recalled would be necessary to complete and effectuate such representation.  In Stinson's dealings with Glover and Nuovo, the request for legal advice need not be expressly requested. It is sufficient if a request for legal assistance is implicit in the communications.  See example, *Aaron v. The Trump Organization, Inc*., Docket No. 8:09–cv–2493–T–23AEP , 2011 WL 13141515 *(M.D. Fla. 10/28/11) (*noting *"*it is important to note that [the attorney client privilege] protection also applies to exchanges of information necessary to formulate or evaluate legal advice"*);  Blueearth Biofuels, LLC v. Hawaiian Electric Co*., Docket No. 09–00181 DAE–KSC  2010 WL 11425708  (D. Haw. 5/11/10);  *Banks v. Office of Senate  Sargent-at-Arms*, 228 F.R.D. 24 *(D.D.C. 2005)(* materials that did not, on their face, disclose that the client sought or an attorney rendered specific legal advice privileged as the communications were intended to be confidential and were part of the process by which the client sought legal advice from counsel*); Amcast Industries, Inc. v. Dextrex Corp., Docket No,*  S88–620(RLM)*, 1991 WL 441904 (N.D. Ind. 7/26/91)(* "While it is essential that the communications between client and attorney concern legal assistance and advice, it is not necessary that the client's request for advice be express"*); Hercules Inc. v. Exxon Corp.,* 434 F.Supp. 136, 144–45 (D.De.1977) ("It is not essential, however, that the request for advice be express. Client communications intended to keep the attorney apprised of continuing business developments, with an implied request for legal advice based thereon, or self-initiated attorney communications intended to keep the client posted on legal developments and implications may also be protected"); *Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26, 37-39 (D.Md.1974) (although "it is essential that communications between client and attorney deal with legal assistance and advice in order to be privileged, it is not essential that such requests by the client for legal advice be expressed). See also, ABA Section of Litigation, The Attorney-Client Privilege and Work Product Doctrine, page 55 (2nd Ed. 1989)

        At issue is if Stinson waived attorney client privilege during conversations where his mother, Michelle Stinson, was also present. In these matters although Ms. Stinson was the UMIC Policy policyholder – she was never sued or a party to the Subrogation Action.  She has no vicarious liability for the unpaid judgment sum owed Concord after application of the $300,000 policy limits payment.  Stinson was an adult by the time of the Subrogation Action trial and his mother's participation in meetings between Stinson and his counsel, while perhaps helpful, was not necessary to assist in the representation or to aid Stinson's understanding of what he was told. As Stinson as around 17 years of age at the time of the 2009 fire event, he was well past the age of majority at the time of the pertinent 2014 Subrogation Action Stinson – Graham/Boylan communications.
        Some courts have found that the presence of other adult family members during an adult's consultation with a lawyer waives the privilege.   See *Fox v. Alfini*, 432 P.3d 596, 600-603 (Col. 2018)(attendance of thirty year old personal injury claimant's parents with her during

her attorney-client meeting waived privilege as their presence was not necessary to assist the representation); *Lynch v. Hamrick*, 968 So. 2.d 11 (Alab. 2007)(adult child's presence at her mother's estate planning meeting with a lawyer waived privilege as they lacked a sufficient common interest in the subject of the conversations); *State v. Shire*, 850 S.W.2d 923, 931 (Mo. Ct. App. 1993) ("The presence of a third person ... such as a relative or friend of the client, who is not essential to the transmission of information or whose presence is not reasonably necessary for the protection of the client's interest, will vitiate the privilege."); *State v. Gordon*, 504 A.2d 1020, 1025-26 (Conn.1985) (privilege waived by presence of wife of client accused of crime at meetings with lawyer concerning trial strategy).

Other states, such as Arizona, have taken a more protective view of the privilege. Arizona courts have focused on the intent of the client. Thus in Arizona, the presence of a third party at an attorney-client conference will therefore cause waiver, unless "the third party's presence does not indicate a lack of intent to keep the communication confidential." *Accomozzo v. Kemp, ex rel, County of Maricopia*, 319 P.3d 231 (Ariz. App. 2014) quoting and citing, *State v. Sucharew,* 205 Ariz. 16, 22, ¶ 11, 66 P.3d 59, 65 (App.2003). The *Accomozzo* Court, again citing and quoting *Sucharew,* stated "[t]he critical question is 'whether the client reasonably understood the conference to be confidential notwithstanding the presence of third parties," 319 P.3d at 235. The *Accomozzo* Court sated the rule "[a]bsent a contrary showing, we presume that when a client authorizes a parent to participate in conferences with her attorney regarding the client's personal matter, and the client and the parent have no adverse interest with respect to that matter, the client has a reasonable expectation that the conferences will be confidential."

The "reasonable expectation" approach to waiver situations involving the presence of close relatives, has been used by other courts. See *Rosati v. Kuzman,* 660 A.2d 263 (R.I.1995) (criminal defendant's parents' attendance of lawyer meetings, where the defendant intended the communications to be confidential, did not waive privilege as the parents' presence failed to create any expectations that communications as among the participants were not confidential. The *Rosati* court determined that because the son's "parents 'occupied a vital role in his defense' .... [and his parents] facilitated the son's relationship with the attorney, accepted other offers of assistance on their son's behalf, and acted as his confidants through a 'tense legal proceeding'); *Stroh v. General Motors Corp.*, 213 A.D. 2d 267, 623 N.Y.S.2d 873 (1st Dept. 1995)(applying the "reasonable expectation of confidentiality under the circumstances" to find no waiver where the client's daughter attended meetings where an "aged woman [was] required to recall, possibly relive, what was probably the most traumatic experience in her life"; and the daughter selected the law firm and transported her 76 year old mother to the meetings, and put her mother "sufficiently at ease to communicate effectively with counsel"); *United States v. Bigos*, 459 F.2d 639 (1st Cir.1972) (finding, with little to no analysis that the presence of client's father during

meeting between attorney and client failed to destroy privilege). See also, *Newman v. State*, 863 A.2d 321 (Md. App. 2004) (adopting *Rosati* approach and finding no waiver of privilege where the client's close personal friend attended counsel meetings because: (1) the record indicated the client's "clear understanding that the communications made in the presence of [the third party] would remain confidential"; (2) the attorney "exerted his control over [the third party's] presence"; and (3) in all times during the "extremely contentious" divorce and custody proceedings, the third party "acted as a source of support for [the client]" by attending court proceedings with the client, participating in investigations, and communicating directly with the attorney).

In *Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir.1984), involving a civil-rights action based on allegedly false arrest, the court held that although the defendant's father was present when he consulted with an attorney about the criminal charges, this did not destroy the attorney-client privilege. The court found the operative principle was the intent of the client as to whether the client reasonably understood the conference to be confidential. The court noted that father had been a business client of the attorney's law firm, and that based on his prior dealings with the firm, the court assumed that he guided his son to it; and the father was acting in a normal and supportive parental fashion. The court concluded that it was the defendant's intention, as well as that of his father, that the consultation with the attorney was to be confidential and privileged).

The Vermont Reporter Notes to V.R. Evid. 502 note that the Rule 502(b) provisions, allowing for the inclusion within the privilege of "various combinations of clients, lawyers, clients' representatives and lawyers' representatives", " are either consistent with present Vermont law or are so obviously an extension of the principles of that law that they are unexceptional" , citing Vermont cases. The Reporter Notes cite *State v. Hodgdon*, 89 Vt. 148 (1915), wherein a communication between a defendant and his lawyer with a lawyer for a co-defendant was not privileged "because the communication between Hodgon and one of his co-defendant's counsel was not a communication between Hodgdon and his own counsel, nor between Hodgdon and an attorney acting in his interests". In another Reporter Note-cited case, *Allen, Adams & Co., v. Harrison*, 30 Vt. 219, 221 (1858), the Court affirmed the admission of testimony from an attorney, who had obtained information from a "nominal party to the suit. who had no interest or control over it", despite the objection the information was covered by attorney client privilege. The Court found the trial court correctly declined to extend the privilege to the statement as it was not communicated to the witness lawyer in his role as the attorney for the party that made the communication.

The court concludes the Rule 502 Reporter Notes and these cases indicate that Vermont would generally find a waiver of attorney -client privilege for communications made in the presence of third persons barring a "common interest" between the third party and the client in issue. (The "common interest" exception to third party waiver is included at Rule 502(b)(3),

without elaboration). Michelle Stinson had no interest in the Subrogation Action or shared exposure with her son on the unpaid judgment balance. She lacks a "common interest" doctrine as the doctrine appears in prior Vermont cases, and as the doctrine has been viewed by courts in the attorney-client privilege setting. As described by one Nevada district court judge:

> Additionally, for the common interest doctrine to apply, the parties must share a common legal interest, rather than a commercial or a financial interest. *Bank Brussels Lambert,* 160 F.R.D. at 447; *Walsh v. Northrop Grumman Corp.,* 165 F.R.D. 16, 18 (E.D.N.Y. 1996); *Bank of America, N.A. v. Terra Nova Ins. Co. Ltd.,* 211 F.Supp.2d 493, 496 (S.D.N.Y.2002); *Blanchard v. Edgemark Financial Corp.,* 192 F.R.D. 233, 237 (N.D.Ill.2000) ("The common interest must be a legal one, not commercial or financial."). "The doctrine does not extend the communications about a joint business strategy that happens to include a concern about litigation. *Walsh,* 165 F.R.D. at 18; *Bank Brussels Lambert,* 160 F.R.D. at 447; *Nidec,* 249 F.R.D. at 579. Similarly, "sharing a desire to succeed in an action does not create a 'common interest' ". *Shamis v. Embassador Factors Corp.,* 34 F.Supp.2d 879, 893 (S.D.N.Y.1999). Finally, even if parties share a common legal interest, the common legal interest exception requires that the communication at issue be designed to further that legal effort. *Nidec,* 249 F.R.D. at 579 (*citing United States v. Bergonzi,* 216 F.R.D. 487, 495 (N.D.Cal.2003)

*FSP Stallion 1, LLC v. Luce,* Docket No. 2:08–cv–01155–PMP-PAl, 2011 WL 3895914 (D. Nev. 9/30/10). The common interest doctrine does not apply. Even as to the Attorney Glover consultations, the common interest doctrine requires a true shared legal interest in the subject of the consultations, not concern over the potential results. It requires more than the fact Attorney Glover was a "family lawyer" for the Stinson family who permitted her to be in attendance at his meetings with her son.

Nor has Michelle Stinson been shown to have been serving as Stinson's agent or "representative" (Rule 502(b)) to the extent she was present or participated in any meetings between Stinson and his counsel.

**Thus the court finds that Stinson waived his attorney client privilege for communications - involving his recall of the 2014 Subrogation Action settlement-related conversations with Ms. Graham or Boylan – that occurred in the presence of Michelle Stinson. For purposes of obtaining discovery of relevant and discoverable information to impeach Stinson, UMIC[18] is entitled to obtain discovery as to what persons present during such point meetings may recall as to what Stinson said or was asked about his memories of those 2014 events.**
**UMIC may take and conduct depositions of Attorneys Glover and Nuovo as described. The non-privileged communications will only relate to client meeting where Michelle Stinson was also present.**

---

[18] Since Boylan's motion for summary judgment has been granted under this opinion, the Boylan defendants will be dismissed form this suit and do not ne dot take further discovery.

Thus the Discovery Motions, Parts 1I to IV are denied except to the extent discovery is ordered or allowed as stated in this order. All parties are to bear their own costs as to those motions.

The court notes there may be some risk that if and after Attorney Nuovo is deposed, UMIC decide Attorney Nuovo is needed as a trial witness and should be disqualified as acting as counsel for Plaintiff in this action. (Vt. Rule Prof. Conduct 3.7). Under the discovery being allowed, the conversations as to which discovery is being allowed will be those with at least two other witnesses present (Stinson and Ms. Stinson).

To administer this case the court will want to identify and address promptly any possible disqualification issues as to Plaintiff's current counsel. Thus if UMIC contends, after completing any Attorney Nuovo deposition, that Attorney Nuovo should be disqualified from serving as Stinson's counsel – a motion to disqualify is to be filed within three weeks after Attorney Nuovo's deposition is completed. If such a motion is filed, once it is briefed the court can apply the Vt. R. Evidence, Rules 401 and 403, and Vt. Prof. Conduct Rules, Rule 3.7(a)(3) considerations to the facts and arguments of counsel.

## Proposed Amended Discovery Schedule

Intermixed with the court motions and memos was the parties' "Amended Scheduling and Discovery Order", signed 10/4/18 and filed 10/9/18, which lays unaddressed by the court.

The court grants that amended schedule, and will allow the parties additional time, to file any supplemental proposed amended discovery schedule, within two weeks after UMIC answers the second amended complaint allowed under this opinion, adding a breach of contract claim.

### SUMMATION

**Stinson's 3/21/19 Motion to file additional briefs is DENIED.**

**UMIC'S 3/27/18 Motion for Partial Summary Judgment as to the Vermont Consumer Protection Act ("VCPA")Claim is GRANTED.**

**Stinson's 7/30/18 Motion for Summary Judgment (as to the portion devoted to VCPA claims) is DENIED.**

**UMIC'S 3/27/18 Motion for Summary Judgment as to the Insurance Bad Faith Claim is DENIED.**

**Stinson's 7/30/18 Motion for Summary Judgment against UMIC (as to the portion devoted to the Insurance Bad Faith Claim) is DENIED.**
**Stinson's 10/1/18 Motion to Amend the Amended Complaint is DENIED in part and GRANTED in part (portion seeking to amend to add a Breach of Contract count is granted).**

**Boylan's 6/5/18 Motion for Summary Judgment is GRANTED.**

41

**Stinson's 7/30/18 Motion for Summary Judgment against Boylan is DENIED.**

**UMIC/ Boylan's May 2018 Discovery- Parts I to IV) – are DENIED, except as to the convening of limited depositions.**

**The October 7, 2018 proposed amended discovery schedule is GRANTED, with leave to file a supplemental proposed amended schedule two weeks after the Second Amended Complaint is filed.**

**The Defendants John J. Boylan II and Boylan Associates, PC, are dismissed from this action.**

_____

Michael J. Harris
Superior Court Judge